# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SHAFIQ RASUL
c/o 14 Inverness Street
London NW1 7 HJ
England;

ASIF IQBAL
c/o 14 Inverness Street
London NW1 7 HJ
England;

RHUHEL AHMED
c/o 14 Inverness Street
London NW1 7 HJ
England; and

JAMAL AL-HARITH
c/o 159 Princess Road
Manchester M14 4RE
England

C.A. No. _____

**Plaintiffs**

- against -

DONALD RUMSFELD
Department of Defense
1000 Defense Pentagon
Washington D.C. 20301-1000;

AIR FORCE GENERAL RICHARD MYERS
Chairman, Joint Chiefs of Staff
9999 Joint Staff Pentagon
Washington, D.C. 20318-9999;

ARMY MAJOR GENERAL GEOFFREY MILLER
Former Commander, Joint Task Force
Guantánamo Bay Naval Base, Cuba,
c/o United States Army
Army Pentagon
Washington, D.C. 20310-0200;

ARMY GENERAL JAMES T. HILL             :
Commander, United States Southern Command  :
c/o United States Army                :
Army Pentagon                     :
Washington, D.C. 20310-0200;         :
                                 :

ARMY MAJOR GENERAL MICHAEL E. DUNLAVEY  :
Former Commander, Joint Task Force    :
Guantánamo Bay Naval Base, Cuba,     :
c/o United States Army                :
Army Pentagon                     :
Washington, D.C. 20310-0200;         :
                                 :

ARMY BRIGADIER GENERAL JAY HOOD    :
Commander, Joint Task Force, GTMO    :
Guantánamo Bay Naval Base, Cuba,     :
c/o United States Army                :
Army Pentagon                     :
Washington, D.C. 20310-0200;         :
                                 :
                                 :

MARINE BRIGADIER GENERAL MICHAEL LEHNERT  :
Commander Joint Task Force-160     :
Guantánamo Bay Naval Base, Cuba     :
c/o Headquarters USMC              :
2 Navy Annex (CMC)                :
Washington, D.C. 20380-1775;         :
                                 :
                                 :

ARMY COLONEL NELSON J. CANNON    :
Commander, Camp Delta            :
Guantánamo Bay Naval Base, Cuba,     :
c/o United States Army                :
Army Pentagon                     :
Washington, D.C. 20310-0200;         :
                                 :

ARMY COLONEL TERRY CARRICO     :
Commander Camp X-Ray, Camp Delta    :
Guantánamo Bay Naval Base, Cuba,     :
c/o United States Army                :
Army Pentagon                     :
Washington, D.C. 20310-0200;         :
                                 :

ARMY LIEUTENANT COLONEL WILLIAM CLINE  :
Commander, Camp Delta            :
Guantánamo Bay Naval Base, Cuba,     :
c/o United States Army                :
Army Pentagon                     :

**Washington, D.C. 20310-0200;**     :
     :
     :
**ARMY LIEUTENANT COLONEL DIANE BEAVER**  :
**Legal Adviser to General Dunlavey**  :
**Guantánamo Bay Naval Base, Cuba**  :
**c/o United States Army**  :
**Army Pentagon**  :
**Washington, D.C. 20310-0200**  :
     :
**and**  :
     :
**JOHN DOES 1-100, individuals involved in the illegal** :
**Torture of Plaintiffs at Guantánamo Bay Naval Base** :
     :
**All in their personal capacities**  :
     :
     **Defendants.**  :
     :

## COMPLAINT

(Violations of the Alien Tort Statute, the Fifth and Eighth Amendments to the U.S. Constitution, the Geneva Conventions, and the Religious Freedom Restoration Act)

Plaintiffs Shafiq Rasul, Asif Iqbal, Rhuhel Ahmed and Jamal Al-Harith, by and through their undersigned attorneys, Baach Robinson & Lewis PLLC and Michael Ratner at the Center for Constitutional Rights, as and for their complaint against Defendants Donald Rumsfeld, Air Force General Richard Myers, Army Major General Geoffrey Miller, Army General James T. Hill, Army Major General Michael E. Dunlavey, Army Brigadier General Jay Hood, Marine Brigadier General Michael Lehnert, Army Colonel Nelson J. Cannon, Army Colonel Terry Carrico, Army Lieutenant Colonel William Cline, Army Lieutenant Colonel Diane Beaver and John Does 1-100, hereby allege as follows:

## INTRODUCTION

1.    Plaintiffs are citizens and residents of the United Kingdom.  They are not now and have never been members of any terrorist group.  They have never taken up arms against the United States.

2.    Plaintiffs Shafiq Rasul, Asif Iqbal and Rhuhel Ahmed were detained in Northern Afghanistan on November 28, 2001, by General Rashid Dostum, an Uzbek warlord temporarily allied with the United States as part of the Northern Alliance. Thereafter, General Dostum placed Plaintiffs Rasul, Iqbal and Ahmed in the custody of the United States military.  Because Plaintiffs Rasul, Iqbal and Ahmed were unarmed and not engaged in any hostile activities, neither General Dostum nor any of his troops ever could have or did observe them engaged in combat against the United States, the Northern Alliance or anyone else.  On information and belief, General Dostum detained Plaintiffs Rasul, Iqbal and Ahmed and numerous other detainees who were not combatants; he handed detainees including Plaintiffs Rasul, Iqbal and Ahmed to the custody of the United States in order to obtain bounty money from the United States; and the United States took custody of Plaintiffs Rasul, Iqbal and Ahmed without any independent good faith basis for concluding that they were or had been engaged in activities hostile to the United States.

3.    Plaintiff Jamal Al-Harith works as an internet web designer in Manchester, England. Intending to attend a religious retreat, Plaintiff Al-Harith arrived in Pakistan on October 2, 2001, where he was advised to leave the country because of animosity toward British citizens. Heeding the warning, he planned to return  to Europe by traveling overland through Iran to Turkey by truck.  While in Pakistan, the truck in which Plaintiff Al-Harith was riding was stolen at gunpoint by Afghans; he was then forced into

a jeep which crossed the border into Afghanistan. Plaintiff Al-Harith was then handed over to the Taliban. Plaintiff Al-Harith was beaten by Taliban guards and taken for interrogation. He was accused of being a British special forces military spy and held in isolation. After the US invasion of Afghanistan, the Taliban released Plaintiff Al-Harith into the general prison population. When the Taliban government fell and the new government came to power, Plaintiff Al-Harith and others in the prison were told that they were free to leave and Plaintiff Al-Harith was offered transportation to Pakistan. Plaintiff Al-Harith thought it would be quicker and easier to travel to Kabul where there was a British Embassy. Officials of the International Committee of the Red Cross ("ICRC") instructed Al-Harith to remain at the prison and they offered to make contact with the British Embassy to fly him home. Plaintiff Al-Harith also spoke directly to British Embassy officials who indicated that they were making arrangements to fly him to Kabul and out of the country. After Plaintiff Al-Harith had been in contact with the British Embassy in Kabul for approximately a month discussing the logistics of evacuating him, American Special Forces arrived and questioned Plaintiff. The ICRC told Plaintiff Al-Harith that the Americans would fly Plaintiff Al-Harith to Kabul; two days before he was scheduled to fly to Kabul, American soldiers told Plaintiff Al-Harith, "You're not going anywhere. We're taking you to Kandahar airbase."

4.    All four Plaintiffs were first held in United States custody in Afghanistan and later transported to the United States Naval Base at Guantánamo Bay Naval Station, Cuba ("Guantánamo"), where Defendants imprisoned them without charge for more than two years. During Plaintiffs' imprisonment, Defendants systematically and repeatedly tortured them in violation of the United States Constitution and domestic and international law, and deprived them of access to friends, relatives, courts and counsel.

Defendants repeatedly attempted to extract confessions from Plaintiffs without regard to the truth or plausibility of these statements through the use of the illegal methods detailed below.

5.      Plaintiffs were released without charge in March 2004 and have returned to their homes in the United Kingdom where they continue to suffer the physical and psychological effects of their prolonged arbitrary detention, torture and other mistreatment as hereinafter alleged.

6.      In the course of their detention by the United States, Plaintiffs were repeatedly struck with rifle butts, punched, kicked and slapped. They were "short shackled" in painful "stress positions" for many hours at a time, causing deep flesh wounds and permanent scarring. Plaintiffs were also threatened with unmuzzled dogs, forced to strip naked, subjected to repeated forced body cavity searches, intentionally subjected to extremes of heat and cold for the purpose of causing suffering, kept in filthy cages for 24 hours per day with no exercise or sanitation, denied access to necessary medical care, harassed in practicing their religion, deprived of adequate food, deprived of sleep, deprived of communication with family and friends, and deprived of information about their status.

7.      Plaintiffs' detention and mistreatment were in plain violation of the United States Constitution, federal statutory law and United States treaty obligations, and customary international law. Defendants' treatment of Plaintiffs and other Guantánamo detainees violated various provisions of law including the Fifth Amendment to the United States Constitution forbidding the deprivation of liberty without due process; the Eighth Amendment forbidding cruel and unusual punishment; United States statutes prohibiting torture, assault, and other mistreatment; the Geneva Conventions; and customary

- 6 -

international law norms prohibiting torture and other cruel, inhuman or degrading treatment.

8.   Plaintiffs' torture and other mistreatment was not simply the product of isolated or rogue actions by individual military personnel.  Rather it was the result of deliberate and foreseeable action taken by Defendant Rumsfeld and senior officers to flout or evade the United States Constitution, federal statutory law, United States treaty obligations and long established norms of customary international law.  This action was taken in a misconceived and illegal attempt to utilize torture and other cruel, inhuman, or degrading acts to coerce nonexistent information regarding terrorism.   It was misconceived because, according to the conclusion of the US military as expressed in the Army Field Manual, torture does not yield reliable information, and because Plaintiffs  along with the vast majority of Guantánamo detainees  had no information to give.  It was illegal because, as Defendants well knew, torture and other cruel, inhuman or degrading treatment of detainees is not permitted under the United States Constitution, federal statutory law, United States treaty obligations, and customary international law.

9.   On or about December 2, 2002, Defendant Rumsfeld signed a memorandum approving numerous illegal interrogation methods, including putting detainees in "stress positions" for up to four hours; forcing detainees to strip naked, intimidating detainees with dogs, interrogating them for 20 hours at a time, forcing them to wear hoods, shaving their heads and beards, keeping them in total darkness and silence, and using what was euphemistically called "mild, non-injurious physical contact." As Defendant Rumsfeld knew, these and other methods were in violation of the United States Constitution, federal statutory law, the Geneva Conventions, and

customary international law as reflected in, inter alia, the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"). This memorandum of December 2, 2002, authorizing torture and other mistreatment, was originally designated by Defendant Rumsfeld to be classified for ten years but was released at the direction of President George W. Bush after the Abu Ghraib torture scandal became public.

10.     After authorizing, encouraging, permitting, and requiring the acts of torture and other mistreatment inflicted upon Plaintiffs, Defendant Rumsfeld, on information and belief, subsequently commissioned a "Working Group Report" dated March 6, 2003, to address "Detainee Interrogations in the Global War on Terrorism: Assessment of Legal, Historical, Policy and Operational Considerations." This report, also originally classified for a period of ten years by Defendant Rumsfeld, was also released after the Abu Ghraib torture scandal became public. This report details the requirements of international and domestic law governing interrogations, including the Geneva Conventions; the CAT; customary international law; the torture statute, 18 U.S.C. §2340; assault within maritime and territorial jurisdiction, 18 U.S.C. §113; maiming, 18 U.S.C. §114; murder, 18 U.S.C. §1111; manslaughter, 18 U.S.C. §1112; interstate stalking, 18 U.S.C. §2261a; and conspiracy 18 U.S.C. §2 and §371. The report attempts to address "legal doctrines under the Federal Criminal Law that could render specific conduct, otherwise criminal not unlawful." Working Group Report at p. 3 (emphasis in original). The memorandum is on its face an ex post facto attempt to create arguments that the facially criminal acts perpetuated by the Defendants were somehow justified. It argues first that the President as Commander-in-Chief has plenary authority to order torture, a proposition that ignores settled legal doctrine from

King John at Runnymede to <u>Youngstown Sheet & Tube</u>, 343 U.S. 579 (1952). It next tries to apply common law doctrines of self-defense and necessity, arguing the erroneous proposition that the United States has the right to torture detained individuals because it needs to defend itself or because it is necessary that it do so. Finally, it suggests that persons inflicting torture and other mistreatment will be able to defend against criminal charges by claiming that they were following orders. The report asserts that the detainees have no Constitutional rights because the Constitution does not apply to persons held at Guantánamo. However, the report acknowledges that U.S. criminal laws do apply to Guantánamo, and further acknowledges that the United States is bound by the CAT to the extent that conduct barred by that Convention would also be prohibited by the Fifth, Eighth or Fourteenth Amendments to the Constitution. On June 22, 2004, the conclusions of this report and other memoranda attempting to justify torture were repudiated and rescinded by President Bush.

11.    In April 2003, following receipt of the Working Group Report, Defendant Rumsfeld issued a new set of recommended interrogation techniques, requiring approval for four techniques.   These recommendations recognized specifically that certain of the approved techniques violated the Geneva Conventions and customary international law, including the use of intimidation, removal of religious items, threats and isolation. The April 2003 report, however, officially withdrew approval for unlawful actions that had been ongoing for months, including hooding, forced nakedness, shaving, stress positions, use of dogs and "mild, non-injurious physical contact." Nevertheless, on information and belief these illegal practices continued to be employed against Plaintiffs and other detainees at Guantánamo.

12.    Defendants well knew that their activities resulting in the detention, torture and other mistreatment of Plaintiffs were illegal and violated clearly established law — i.e., the Constitution, federal statutory law and treaty obligations of the United States and customary international law.    Defendants' after-the-fact attempt to create an Orwellian legal façade makes clear their conscious awareness that they were acting illegally.  Therefore they cannot claim immunity from civil liability.

## JURISDICTION AND VENUE

13.    This Court has jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331 (federal question jurisdiction); and 28 U.S.C. §1350 (Alien Tort Statute).

14.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(3) and 28 U.S.C. § 1391(b)(2).  The alleged acts described below are "inextricably bound up with the District of Columbia in its role as the nation's capital." Mundy v. Weinberger, 554 F. Supp. 811, 818 (D.D.C. 1982).  Decisions and acts by Defendants ordering, facilitating, aiding and abetting, acquiescing, confirming and/or conspiring in the commission of the alleged acts reached the highest levels of the United States Government.    On information and belief, approval for all alleged acts emanated under color of law from orders, approvals, and omissions occurring in the Pentagon, numerous government agencies headquartered in the District of Columbia, and the offices of Defendant Rumsfeld, several of which are in the District of Columbia.    Venue for claims arising from acts of Cabinet officials, the Secretary of Defense and United States agencies lies in the District of Columbia.  See id.; Smith v. Dalton, 927 F. Supp. 1 (D.D.C. 1996).

## PARTIES

15.     Plaintiff Shafiq Rasul was born in the United Kingdom and has been at all times relevant hereto a citizen and resident of the United Kingdom.  He is not now and has never been a terrorist or a member of a terrorist group.  He has never taken up arms against the United States.  At the time of his initial arrest and detention, he was 24 years old.

16.     Plaintiff Asif Iqbal was born in the United Kingdom and has been at all times relevant hereto a citizen and resident of the United Kingdom.  He is not now and has never been a terrorist or a member of a terrorist group.  He has never taken up arms against the United States.  At the time of his initial arrest and detention, he was 20 years old.

17.     Plaintiff Rhuhel Ahmed was born in the United Kingdom and has been at all times relevant hereto a citizen and resident of the United Kingdom.  He is not now and has never been a terrorist or a member of a terrorist group.  He has never taken up arms against the United States.  At the time of his initial arrest and detention, he was 19 years old.

18.     Plaintiff Jamal Al-Harith was born in the United Kingdom and has been at all times relevant hereto a citizen and resident of the United Kingdom.  He is not now and has never been a terrorist or a member of a terrorist group.  He has never taken up arms against the United States.  At the time of his initial arrest and detention, he was 35 years old.

19.     Defendant Donald Rumsfeld is the United States Secretary of Defense.  On information and belief, he is a citizen of Illinois and a resident of the District of Columbia.  Defendant Rumsfeld is charged with maintaining the custody and control of

the Guantánamo detainees, including Plaintiffs, and with assuring that their treatment was in accordance with law.  Defendant Rumsfeld ordered, authorized, condoned and has legal responsibility for the arbitrary detention, torture and other mistreatment of Plaintiffs as alleged herein.  Defendant Rumsfeld is sued in his individual capacity.

20.   Defendant Myers is a General in the United States Air Force and was at times relevant hereto Chairman of the Joint Chiefs of Staff.  On information and belief, he is a citizen and resident of Virginia.  As the senior uniformed military officer in the chain of command, Defendant Myers is charged with maintaining the custody and control of the Guantánamo detainees, including Plaintiffs, and with assuring that their treatment was in accordance with law.  On information and belief, Defendant Myers was informed of torture and other mistreatment of detainees at Guantánamo and Abu Ghraib prison in Iraq and condoned such activities.  Defendant Myers was in regular contact with Defendant Rumsfeld and participated in and implemented decisions taken in the District of Columbia.  Defendant Myers is sued in his individual capacity.

21.   Defendant Miller is a Major General in the United States Army and was at times relevant hereto Commander of Joint Task Force-GTMO.  On information and belief, he is a citizen and resident of Texas.  At times relevant hereto, he had supervisory responsibility for Guantánamo detainees, including Plaintiffs, and was responsible for assuring that their treatment was in accordance with law.  On information and belief, Defendant Miller was in regular contact with Defendant Rumsfeld and other senior officials in the chain of command based in the District of Columbia and participated in and implemented decisions taken in the District of Columbia.  On information and belief, Defendant Miller implemented and condoned numerous methods of torture and other mistreatment as hereinafter described. On information and belief,

- 12 -

Defendant Miller was subsequently transferred to Abu Ghraib where he implemented and facilitated torture and other mistreatment of detainees there. These acts were filmed and photographed and have justly inspired widespread revulsion and condemnation around the world. Defendant Miller is sued in his individual capacity.

22. Defendant Hill is a General in the United States Army and was at times relevant hereto Commander of the United States Southern Command. On information and belief, he is a citizen and resident of Texas. On information and belief, Defendant Hill was in regular contact with Defendant Rumsfeld and other senior officials in the chain of command based in the District of Columbia and participated in and implemented decisions taken in the District of Columbia. On information and belief, General Hill requested and recommended approval for several abusive interrogation techniques which were used on Guantánamo detainees, including Plaintiffs. Defendant Hill is sued in his individuals capacity.

23. Defendant Dunlavey is a Major General in the United States Army and was at times relevant hereto Commander of Joint Task Forces 160/170, the successors to Joint Task Force-GTMO. On information and belief, he is a citizen and resident of Pennsylvania. At times relevant hereto, he had supervisory responsibility for Guantánamo detainees, including Plaintiffs, and for assuring that their treatment was in accordance with law. On information and belief, Defendant Dunlavey was in regular contact with Defendant Rumsfeld and other senior officials in the chain of command based in the District of Columbia and participated in and implemented decisions taken in the District of Columbia. On information and belief, Major General Dunlavey implemented and condoned the torture and other cruel, inhuman or degrading acts and conditions alleged herein. Defendant Dunlavey is sued in his individual capacity.

24.     Defendant Hood is a Brigadier General in the United States Army and is the Commander of Joint Task Force-GTMO, which at all relevant times operated the detention facilities at Guantánamo.  On information and belief, he is a citizen and resident of South Carolina.  At times relevant hereto, he had supervisory responsibility for Guantánamo detainees, including Plaintiffs, and for assuring that their treatment was in accordance with law.  On information and belief, Defendant Hood has been and continues to be in regular contact with Defendant Rumsfeld and other senior officials in the chain of command based in the District of Columbia and participated in and implemented decisions taken in the District of Columbia.  Defendant Hood is sued in his individual capacity.

25.     Defendant Lehnert is a Brigadier General in the United States Marine Corps and was at times relevant hereto Commander of the Joint Task Force responsible for the construction and operation of Camp X-Ray and Camp Delta at Guantánamo. On information and belief, he is a citizen and resident of Florida.  At times relevant hereto, he had supervisory responsibility for Guantánamo detainees, including Plaintiffs, and for assuring that their treatment was in accordance with law.   On information and belief, Defendant Lehnert was in regular contact with Defendant Rumsfeld and other senior officials in the chain of command based in the District of Columbia and participated in and implemented decisions taken in the District of Columbia. Defendant Lehnert is sued in his individual capacity.

26.     Defendant Cannon is a Colonel in the United States Army and the Commander of Camp Delta at Guantánamo. On information and belief, he is a citizen and resident of Michigan.  At times relevant hereto, he has and continues to have supervisory responsibility for Guantánamo detainees including Plaintiffs and for

assuring that their treatment was in accordance with law. On information and belief, Defendant Cannon has been in regular contact with Defendant Rumsfeld and other senior officials in the chain of command based in the District of Columbia and participated in and implemented decisions taken in the District of Columbia. Defendant Cannon is sued in his individual capacity.

27. Defendant Carrico is a Colonel in the United States Army and was at times relevant hereto Commander of Camp X-Ray and Camp Delta at Guantánamo. On information and belief, he is a citizen and resident of Texas. At times relevant hereto, he had supervisory responsibility for Guantánamo detainees including Plaintiffs and for assuring that their treatment was in accordance with law. On information and belief, Defendant Carrico was in regular contact with Defendant Rumsfeld and other senior officials in the chain of command based in the District of Columbia and participated in and implemented decisions taken in the District of Columbia. Defendant Carrico is sued in his individual capacity.

28. Defendant Beaver is a Lieutenant Colonel in the United States Army and was at times relevant hereto Chief Legal Adviser to Defendant Dunlavey. On information and belief, she is a citizen and resident of Kansas. On information and belief, knowing that torture and other mistreatment were contrary to military law and regulations, she nevertheless provided an opinion purporting to justify the ongoing torture and other mistreatment of detainees at Guantánamo, including Plaintiffs. On information and belief, Defendant Beaver was in regular contact with Defendant Rumsfeld and other senior officials in the chain of command based in the District of Columbia and participated in and implemented decisions taken in the District of Columbia. Defendant Beaver is sued in her individual capacity.

29.     Plaintiffs do not know the true names and capacities of other Defendants sued herein and therefore sue these defendants by fictitious names, John Does 1-100. Plaintiffs will amend this complaint to allege their true names and capacities when ascertained. John Does 1-100 are the military and civilian personnel who participated in the torture and other mistreatment of Plaintiffs as hereinafter alleged.

## FACTUAL ALLEGATIONS

30.     Plaintiffs are citizens and residents of the United Kingdom.

31.     Plaintiffs Rasul, Iqbal and Ahmed are boyhood friends and grew up streets away from each other in the working-class town of Tipton in the West Midlands of England.

32.     Plaintiff Shafiq Rasul attended a Catholic elementary school before studying at the same high school as Plaintiffs Iqbal and Ahmed. An avid soccer fan, Plaintiff Rasul played for a local team before going on to study computer science at the University of Central England. He also worked part time at an electronics store.

33.     Plaintiff Asif Iqbal attended the same elementary school as Plaintiff Rasul and the same high school as both Plaintiffs Rasul and Ahmed. After leaving high school, Plaintiff Iqbal worked at a local factory making road signs and building bus shelters. He was also an active soccer player and volunteered at the local community center.

34.     Plaintiff Rhuhel Ahmed attended the same high school as Plaintiffs Iqbal and Ahmed. Like Plaintiff Iqbal, he worked at a local factory and worked with children and disabled people at the local government-funded Tipton Muslim Community Center.

35.    In September 2001, Plaintiff Iqbal traveled to Pakistan to join his father who had arranged a marriage for him with a young woman from his family's ancestral village. His longtime friend, Plaintiff Ahmed traveled from England in October in order to join him at his wedding as his best man. Plaintiff Rasul was at the same time in Pakistan visiting his family with the expectation of continuing his degree course in  computer science degree within the month.  Prior to the wedding in Pakistan, in October 2001, Plaintiffs Rasul, Iqbal and Ahmed crossed the border into Afghanistan in order to offer help in the ongoing humanitarian crisis. After the bombing in Afghanistan began, Plaintiffs Rasul, Iqbal and Ahmed tried to return to Pakistan but were unable to do so because the border had been closed. Plaintiffs never engaged in any terrorist activity or took up arms against the United States.

36.    Plaintiffs Rasul, Iqbal and Ahmed never engaged in combat against the forces of the United States or any other entity.  Plaintiffs Rasul, Iqbal and Ahmed never conducted any terrorist activity or conspired, intended, or planned to conduct any such activity.  Plaintiffs Rasul, Iqbal and Ahmed never belonged to Al Qaeda or any other terrorist organization.

### Detention in Afghanistan

37.    On November 28, 2001, Plaintiffs Rasul, Iqbal and Ahmed were captured and detained by forces loyal to General Rashid Dostum, an Uzbek warlord who was aligned with the United States.

38.    No U.S. forces were present when Plaintiffs Rasul, Iqbal and Ahmed were detained.  Therefore, no U.S. forces could have had any information regarding Plaintiffs other than that supplied by the forces of General Dostum, who were known to be

unreliable and who were receiving a per head bounty of, on information and belief, up to $ 35,000.

39.    With U.S. military forces present, Plaintiffs Rasul, Iqbal and Ahmed, along with 200 to 300 others, were crammed into metal containers and transported by truck to Sherbegan prison in Northern Afghanistan. General Dostum's forces fired holes into the sides of the containers with machine guns, striking the persons inside. Plaintiff Iqbal was struck in his arm, which would later become infected. Following the nearly 18-hour journey to Sherbegan prison, Plaintiffs Rasul, Iqbal and Ahmed were among what they estimate to have been approximately 20 survivors in the container.

40.    Plaintiffs Rasul, Iqbal and Ahmed were held in Sherbegan by General Dostum's forces for about one month, where they were exposed to extremely cold conditions without adequate clothing, confined to tight spaces, and forced to ration food. Prison conditions were filthy. Plaintiffs Rasul, Iqbal and Ahmed and other prisoners suffered from amoebic dysentery and were infested with lice.

41.    In late December 2001, the ICRC visited with Plaintiffs Rasul, Iqbal and Ahmed and informed them that the British Embassy in Islamabad, Pakistan had been advised of their situation and that embassy officials would soon be in contact with Plaintiffs.

42.    On December 28, 2001, U.S. Special Forces arrived at Sherbegan and were informed of the identities of Plaintiffs Rasul, Iqbal and Ahmed.

43.    General Dostum's troops chained Plaintiffs Rasul, Iqbal and Ahmed and marched them through the main gate of the prison, where U.S. Special Forces surrounded them at gunpoint.

44.    From December 28, 2001 until their release in March 2004, Plaintiffs Rasul, Iqbal and Ahmed were in the exclusive physical custody and control of the United States military. In freezing temperatures, Plaintiffs Rasul, Iqbal and Ahmed were stripped of their clothes, searched, and photographed naked while being held by Defendant John Does, two U.S. Special Forces soldiers. American military personnel took Plaintiffs Rasul, Iqbal and Ahmed to a room for individual interrogations. Plaintiff Rasul was bound hand and foot with plastic cuffs and forced onto his knees before an American soldier in uniform.    Both Plaintiffs Rasul and Iqbal were interrogated immediately and without knowledge of their interrogators' identities.    Both were questioned at gunpoint. While Plaintiff Iqbal was interrogated, Defendant John Doe held a 9mm pistol physically touching his temple. At no time were Plaintiffs Rasul, Iqbal and Ahmed afforded counsel or given the opportunity to contact their families.

45.    Following their interrogations, Plaintiffs Rasul, Iqbal and Ahmed were led outside where a Defendant John Doe immediately covered their eyes by putting sandbags over their heads and applying thick masking tape. They were placed side-by-side, barefoot in freezing temperatures, with only light clothing, for at least three to four hours. While hooded and taped, Plaintiffs Rasul, Iqbal and Ahmed were repeatedly threatened with beatings and death and were beaten by a number of Defendant John Does, U.S. military personnel. Plaintiff Iqbal estimates that he was punched, kicked, slapped, and struck by US military personnel with rifle butts at least 30 or 40 times.

46.    Thereafter, Plaintiffs Rasul, Iqbal and Ahmed were placed in trucks with other detainees and transported to an airport about 45 minutes away.

47.    Plaintiffs Rasul and Iqbal were led onto one plane and Plaintiff Ahmed was led onto a second plane. Plaintiffs Rasul, Iqbal and Ahmed, still hooded with their

hands tied behind their backs and their legs tied in plastic cuffs, were fastened to a metal belt attached to the floor of each aircraft. The soldiers instructed Plaintiffs Rasul, Iqbal and Ahmed to keep their legs straight out in front of them as they sat. The position was extremely painful. When any of Plaintiffs or other detainees tried to move to relieve the pain, an unknown number of Defendant John Does struck Plaintiffs and others with rifle butts. Plaintiffs Rasul, Iqbal and Ahmed were flown by the U.S. military to Kandahar.

48. Upon arrival in Kandahar, Plaintiffs Rasul, Iqbal and Ahmed, still covered with hoods, were led out of the planes. A rope was tightly tied around each of their right arms, connecting the detainees together.

49. Plaintiffs Rasul, Iqbal and Ahmed, who were still without shoes, were forced to walk for nearly an hour in the freezing cold, causing them to sustain deep cuts on their feet and rope burns on their right arms.

50. Plaintiffs Rasul, Iqbal and Ahmed were herded into a tent, where soldiers forced them to kneel with their legs bent double and their foreheads touching the ground. With their hands and feet still tied, the position was difficult to maintain. Plaintiffs Rasul, Iqbal and Ahmed were repeatedly and violently beaten by Defendant John Does, US soldiers. Each was asked whether he was a member of Al Qaeda and when each responded negatively, each was punched violently and repeatedly by soldiers. When Plaintiffs Rasul Iqbal and Ahmed identified themselves as British nationals, Defendants John Doe soldiers insisted they were "not white" but "black" and accordingly could not be British. The soldiers continued to beat them.

51. Plaintiffs Rasul, Iqbal and Ahmed were "processed" by American soldiers, and had plastic numbered wristbands placed on their wrists. Soldiers kicked Plaintiff

Rasul, assigned the number 78, several times during this process. American soldiers cut off his clothes and conducted a body cavity search. He was then led through an open-air maze constructed of barbed wire. Plaintiffs Iqbal, assigned number 79, and Ahmed, assigned number 102, experienced the same inhumane treatment.

52.    Plaintiffs Rasul, Iqbal and Ahmed, dehydrated, exhausted, disoriented, and fearful, were summoned by number for interrogation. When called, each was shackled and led to an interrogation tent. Their hoods were removed and they were told to sit on the floor. An armed soldier stood behind them out of their line of sight. They were told that if they moved they would be shot.

53.    After answering questions as to their backgrounds, Plaintiffs Rasul, Iqbal and Ahmed were each photographed by soldiers. They were fingerprinted and a swab from their mouth and hairs plucked from their beards were taken for DNA identification.

54.    An American soldier questioned Plaintiff Iqbal a second time. Plaintiff Iqbal was falsely accused by the interrogator of being a member of Al Qaeda. Defendant John Does, US soldiers, punched and kicked Plaintiff Iqbal in the back and stomach before he was dragged to another tent.

55.    Personnel believed by Plaintiffs to be British military personnel later interrogated Plaintiffs Rasul, Iqbal and Ahmed, with US soldiers present.    Plaintiffs Rasul, Iqbal and Ahmed were falsely accused of being members of the Al Muhajeroon. During the interrogation, Plaintiffs Rasul, Iqbal and Ahmed were threatened by Defendant John Does, armed American soldiers, with further beatings if they did not admit to various false statements.

56.    Plaintiffs Rasul and Ahmed slept in a tent with about 20 other detainees. Plaintiff Iqbal was in another tent. The tents were surrounded by barbed wire.

Detainees were not allowed to talk and were forced to sleep on the ground. American soldiers woke the detainees hourly as part of a systematic effort to deprive them of sleep.

57.    Defendant John Does, interrogators and guards, frequently used physical violence and unmuzzled dogs to threaten and intimidate Plaintiffs Rasul, Iqbal and Ahmed and other detainees during the interrogations.

58.    At or around midnight of January 12 or 13, 2002, US army personnel entered the tent of Plaintiffs Rasul and Ahmed. Both were made to lie on the ground, were shackled, and rice sacks were placed over their heads. They were led to another tent, where Defendant John Does, US soldiers, removed their clothes and forcibly shaved their beards and heads. The forced shaving was not intended for hygiene purposes, but rather was, on information and belief, designed to distress and humiliate Plaintiffs given their Muslim faith, which requires adult males to maintain beards.

59.    Plaintiff Rasul was eventually taken outside where he could hear dogs barking nearby and soldiers shouting, "Get 'em boy." He was then given a cavity search and photographed extensively while naked before being given an orange uniform. Soldiers handcuffed Plaintiff Rasul's wrists and ankles before dressing him in black thermal gloves, dark goggles, earmuffs, and a facemask. Plaintiff Rasul was then left outside for hours in freezing temperatures.

60.    Plaintiff Iqbal, who was in another tent, experienced similar treatment of being led from his tent to be shaved and stripped naked.

61.    Plaintiffs Rasul and Iqbal were escorted onto large cargo planes. Still shackled and wearing facemasks, both were chained to the floor with no backrests. They were forced by Defendant John Does to sit in an uncomfortable position for the

entire flight to Guantánamo (of approximately eighteen to twenty hours) and were not allowed to move or given access to toilet facilities.

62.     Plaintiff Ahmed remained in Kandahar for another month.   American soldiers interrogated him four more times.  Sleep-deprived and malnourished, Plaintiff Ahmed was also interrogated by  British agents who, on information and belief were from the British intelligence agency, MI5, and he was falsely told that Plaintiffs Rasul and Iqbal had confessed in Cuba to allegations of membership in the Al Muhajeroon. He was told that he could return to the United Kingdom in exchange for admitting to various accusations.  Distraught, fearful of further beatings and abuse, and without benefit of contact with family or counsel, Plaintiff Ahmed made various false confessions. Plaintiff Ahmed was thereafter transported to Guantánamo.

63.     As noted above, Plaintiff Al Harith was being held in custody by the Taliban in Southern Afghanistan as a suspected British spy. He was interrogated and beaten by Taliban troops. When the Taliban government fell, Plaintiff Al-Harith was in a Taliban prison.  He contacted the British Embassy through the ICRC and by satellite phone and was assured he would be repatriated to Britain.  Two days before his scheduled repatriation, US forces informed him that he was being detained and taken to Kandahar, where he was held in a prison controlled by US forces and interrogated and beaten by US troops.  Plaintiff Al Harith was flown to Guantánamo from Kandahar on or about February 11, 2002.

64.     Prior to take-off, Plaintiff Al-Harith, like Plaintiffs Rasul, Iqbal and Ahmed, was hooded and shackled; mittens were placed on his hands and earphones over his ears. Chains were then placed around his legs, waist and the earphones.  The chains

cut into his ears   Goggles were placed on his eyes and a medical patch that, on information and belief, contained muscle relaxant was applied.

### Captivity and Conditions at Camp X-Ray, Guantánamo

65.    Plaintiffs Rasul and Iqbal were transported to Guantánamo in mid-January 2002. Plaintiffs Ahmed and Al-Harith were transported there approximately one month later. During the trip, Defendant John Does, US soldiers, kicked and punched Plaintiff Ahmed more than twenty times. Plaintiff Al-Harith was punched, kicked and elbowed repeatedly and was threatened with more violence.

66.    Upon arrival at Guantánamo, Plaintiffs were placed on a barge to get to the main camp. Defendant John Does, US Marines on the barge, repeatedly beat all the detainees, including Plaintiffs, kicking, slapping, elbowing and punching detainees in the body and head. The Marines announced repeatedly, "You are arriving at your final destination," and, "You are now property of the United States Marine Corps."

67.    Plaintiffs were taken to Camp X-Ray, the prison camp for detainees. Soldiers forced all four Plaintiffs on arrival to squat outside in stress positions in the extreme heat. Plaintiffs and the other detainees had their goggles and hoods removed, but they had to remain with their eyes closed and were not allowed to speak.

68.    Plaintiff Iqbal, still shackled and goggled, fell over and started shaking. Plaintiff Iqbal was then given a cavity search and transported to another area for processing, including fingerprinting, DNA sampling, photographs, and another wristband.

69.    Plaintiff Rasul was forced to squat outside for six to seven hours and went through similar processing.  Unmuzzled barking dogs were used to intimidate Plaintiff Rasul and others. At one point, Defendant John Doe, a soldier from a unit known as the

Extreme Reaction Force (ERF), repeatedly kicked Plaintiff Rasul in the back and used a riot shield to slam him against a wall.

70.     After processing, Plaintiffs were placed in wire cages of about 2 meters by 2 meters. Conditions were cruel, inhuman and degrading.

71.     Plaintiffs were forced to sit in their cells in total silence for extended periods. Once a week, for two minutes, Plaintiffs were removed from their cells and showered. They were then returned to their cells. Once a week, Plaintiffs were permitted five minutes recreation while their hands remained chained.

72.     Plaintiffs were exposed to extreme heat during the day, as their cells were situated in the direct sunlight.

73.     Plaintiffs were deliberately fed inadequate quantities of food, keeping them in a perpetual state of hunger. Much of the food consisted of "MRE's" (meals ready to eat), which were ten to twelve years beyond their usable date. Plaintiffs were served out of date powdered eggs and milk, stale bread from which the mold had been picked out and fruit that was black and rotten.

74.     Plaintiffs and other detainees were forced to kneel each time a guard came into their cells.

75.     Plaintiffs at night were exposed to powerful floodlights, a purposeful tactic to promote sleep deprivation among the detainees. Plaintiffs and the other detainees were prohibited from putting covers over their heads to block out the light and were prohibited from keeping their arms beneath the covers.

76.     Plaintiffs were constantly threatened at Camp X-Ray, with guards stating on multiple occasions, "We could kill you at any time; the world doesn't know you're here; we could kill you and no one would know."

77.     Plaintiff Al-Harith was taken to the medical clinic and was told that his blood pressure was too high. He was given, on information and belief, muscle relaxant pills and an injection of an unspecified substance.

78.     On various occasions, Plaintiffs' efforts to pray were banned or interrupted. Plaintiffs were never given prayer mats and did not initially receive copies of the Koran. Korans were provided to them after approximately a month. On one occasion, a guard in Plaintiff Ahmed's cellblock noticed a copy of the Koran on the floor and kicked it. On another occasion, a guard threw a copy of the Koran in a toilet bucket. Detainees, including Plaintiffs, were also at times prevented from calling out the call to prayer, with American soldiers either silencing the person who was issuing the prayer call or playing loud music to drown out the call to prayer. This was part of a continuing pattern of disrespect and contempt for Plaintiffs' religious beliefs and practices.

## Interrogation at Camp X-Ray

79.     Plaintiffs were extensively interrogated at Camp X-Ray.

80.     During interrogations, Plaintiffs were typically "long shackled," whereby their legs were chained using a large padlock. The shackles had sharp edges that scraped the skin, and all Plaintiffs experienced deep cuts on and around their ankles, resulting in scarring and continuing chronic pain. During the interrogations, Plaintiffs were shackled and chained to the floor. Plaintiffs were repeatedly urged by American interrogators to admit that they were fighters who went to Afghanistan for "jihad." In return, Plaintiffs were promised that if they confessed to these false assertions, they could return to the United Kingdom. Plaintiff Iqbal, who was interrogated five times by

American forces over three months at Camp X-Ray, was repeatedly encouraged and coerced to admit to having been a "fighter."

81.     Plaintiff Al-Harith was interrogated approximately ten times at Camp X-Ray. He was interrogated by both British and American authorities. On one occasion, an interrogator asked Plaintiff Al-Harith to admit that he went to Pakistan to buy drugs, which was not true. On another occasion, Plaintiff Al-Harith was told that there was a new terrorism law that would permit the authorities to put his family out in the street if Plaintiff Al-Harith did not admit to being a drug dealer or a fighter. On another occasion, interrogators promised money, a car, a house and a job if he admitted those things. As they were not true, he declined to admit them.

82.     Following Plaintiff Ahmed's first several interrogations at Camp X-Ray, he was isolated in a cellblock where there were only Arabic speakers. Plaintiff Ahmed, who does not speak Arabic, was unable to communicate with anyone other than interrogators and guards for approximately five months.

## Conditions at Camp Delta

83.     Around May 2002, Plaintiffs were transferred to Camp Delta.

84.     At no time were Plaintiffs advised as to why they were being transferred, for what purpose they were detained, why they were considered "unlawful combatants," and what medical and legal resources might be available.

85.     At Camp Delta, Plaintiffs were housed in mesh cages that were subdivided from a larger metal container. There was little to no privacy and the cages provided little shelter from the heat during the day or the cold at night. The cages quickly rusted because of the sea air. The cells contained metal slabs at waist height;

detainees could not sit on the slabs because their legs would dangle off and become numb. There was not enough room in the cells to pray.

86.     Constant reconstruction work and large electric generators, which ran 24 hours a day, were used as part of a strategic effort to deprive Plaintiffs and others of sleep. Lights were often left on 24 hours a day.

87.     Plaintiffs Rasul and Iqbal were in the same cellblock.  Plaintiff Ahmed was placed in isolation for about one month.  There was no explanation given as to why Plaintiff Ahmed had been placed in isolation.  Following this period, he was placed in a different cell and interrogated by mostly American interrogators who repeatedly asked him the same questions for six months.

88.     After six months at Camp Delta, Plaintiff Ahmed was moved to a cell directly opposite Plaintiff Rasul.  Plaintiff Iqbal was placed in isolation for about one month. Again, no explanation was given for the arbitrary placement in isolation.

89.     Plaintiff Ahmed was repeatedly disciplined with periods of isolation for such behavior as complaining about the food and singing.

90.     Plaintiff Iqbal, after about one month at Camp Delta, was moved to isolation and given smaller food portions because it was believed he was belittling a military policeman.  He was disciplined with another week of isolation when he wrote "have a nice day" on a Styrofoam cup.

91.     After his last period of isolation, Plaintiff Iqbal was moved to a block which housed only Chinese-speaking detainees.  During his time there, he was exposed to aggressive interrogation.  After being there for months, Plaintiff Iqbal's mental condition deteriorated further.

92.    Plaintiff Al-Harith was put into isolation for refusing to wear a wristband. Plaintiff Al-Harith was also placed in isolation for writing the letter "D" on a Styrofoam cup. The isolation block was freezing cold as cold air was blown through the block twenty-four hours a day.  The isolation cell was pitch black as the guards claimed the lights were not working.  Plaintiff Al-Harith was placed in isolation a second time around Christmas 2002 for refusing to take an unspecified injection.  When he refused, the ERF was brought in and Plaintiff Al-Harith was "ERFed": he was beaten, forcibly injected and chained in a hogtied position, with his stomach on the floor and his arms and legs chained together above him.  The ERF team jumped on his legs and back and kicked and punched Plaintiff Al-Harith.   Plaintiff Al-Harith was then placed in isolation for approximately a month, deprived at various intervals of soap, toothpaste or a toothbrush, blankets or toilet paper.  He was also deprived of a Koran during this second period of isolation.

93.    On information and belief, "ERFings," i.e., the savage beatings administered by the ERF teams, were videotaped on a regular basis and should be available as evidence of the truth of the allegations contained herein.

94.    The Camp Delta routine included compulsory "recreation" twice a week for fifteen minutes.  Attendance was enforced by the ERF.  As soon as fifteen minutes had passed, detainees were immediately returned to their cells.  Plaintiff Rasul noted that one would be forced to return to his cell even if in the middle of prayers.

95.    Around August 2002, medical corps personnel offered Plaintiffs Rasul, Iqbal and Ahmed injections of an unidentified substance.  Plaintiffs Rasul, Iqbal and Ahmed, like most detainees, refused.  Soon after, Defendant John Does, the medical corps, returned with the ERF team.  The ERF team members were dressed in padded

gear, thick gloves, and helmets. Plaintiffs Rasul, Iqbal and Ahmed were shackled and restrained with their arms and legs bent backwards while medical corps pulled up their sleeves to inject their arms with an unidentified drug that had sedative effects.

96.    Plaintiffs Rasul, Iqbal and Ahmed received these injections against their will on approximately a dozen occasions. Plaintiff Al-Harith received 9 or 10 compulsory injections on six separate occasions.

97.    Plaintiff Iqbal was deprived of his Koran and other possessions. His hands were shackled in front of him. When Plaintiff Iqbal looked back, a guard pushed him in the corner. There Defendant John Does punched him repeatedly in the face and kneed him in his thigh.

### Isolation and Interrogations at Camp Delta

98.    Interrogation booths either had a miniature camera hidden in them or a one-way glass window. Thus, on information and belief, some or all of the interrogations of Plaintiffs and other detainees are recorded and are available as evidence of the truth of Plaintiffs' allegations herein.

99.    In December 2002, a tiered reward system was introduced at Camp Delta, whereby detainees were placed on different levels or tiers depending on their level of co-operation and their behavior at the camp.

100.    Interrogators and guards frequently promised to provide or threatened to withdraw of essential items such as blankets or toothpaste – referred to as "comfort items" – in order to coerce detainees into providing information. The truthful assertion that Plaintiffs had no information to give did not result in the provision of "comfort items." To the contrary, the interrogators demanded that the Plaintiffs confess to false allegations and promised "comfort items" in exchange.

101.     Isolation of detainees was frequently used as a technique to "wear down" detainees prior to interrogation. There were two primary ways in which prisoners would be placed in isolation: (1) for punishment, for a set period of time for a specific reason; or (2) for interrogation, with no specific time limit.

102.     Between October 2002 and May 2003, Plaintiff Rasul was interrogated about five or six times. Most of the interrogations involved the same questions that had been asked before. In April 2003, Plaintiffs Rasul and Iqbal were given polygraph tests and were led to believe that they might be allowed to return home if they passed.

103.     After two hours of questioning as to whether he was a member of Al Qaeda, Plaintiff Rasul was returned to his cell. Two weeks later, he was interrogated by a woman who may have been army personnel in civilian clothing. She informed him that he had passed the polygraph test. Plaintiff Rasul was transferred to a different cellblock and informed by interrogators that they had videos which proved that he and Plaintiffs Iqbal and Ahmed were members of Al Qaeda and linked to the September 11 attacks.

104.     A week later, Plaintiff Rasul was transferred to an isolation block, called "November." Plaintiff Rasul asked the army sergeant why he was being moved and was informed that the order was from the interrogators. Plaintiff Rasul was placed in a metal cell. To make the conditions of confinement continuously debilitating, the air conditioning was turned off during the day and turned on high at night. Temperatures were near 100 degrees during the day and 40 degrees at night. The extremes of heat and cold were deliberately utilized to intimidate, discomfort and break down prisoners. For one week, Plaintiff Rasul was held in isolation without interrogation. Later, he was taken to a room and "short shackled" and placed in an extremely cold room for six to

seven hours. Short shackling consists of chaining the ankles and wrists closely together to force the detainee into a contorted and painful position. He was unable to move in the shackles and was not afforded an opportunity to go to the bathroom. He was hardly able to walk and suffered severe back pains. He was taken back to his cell without explanation.

105.    The next day Plaintiff Rasul was "short shackled" and chained to the floor again for interrogation by an US Army intelligence officer named Bashir, also known as Danny. He was shown photographs of three men who were supposedly Plaintiffs Rasul, Iqbal and Ahmed with a man purported to be Mohammed Atta. Plaintiff Rasul repeatedly and truthfully denied being the person in the photograph. Further, he repeatedly and truthfully denied any involvement with Al Qaeda or the September 11 attacks. On five or six more occasions, Plaintiff Rasul was interrogated in similar fashion. During these interrogations, Plaintiff Rasul was not provided with food and was not permitted to pray.

106.    Following the first interrogation, on five or six occasions, Plaintiff Rasul was removed from his cell and brought back to the interrogation block for intervals of about four or five days at a time. He was repeatedly "short shackled," exposed to extremely loud rock or heavy metal music, and left alone in the interrogation room for up to 13 hours in the "long shackle" position.

107.    During this period, a Marine captain and other soldiers arrived at Plaintiff Rasul's cell to transfer him to another block, where he would remain in isolation for another two months without "comfort items."

108.    On one occasion, Plaintiff Rasul was brought to the interrogation room from isolation to be questioned by interrogators from the Criminal Investigations Division

(CID).  These interrogators, identified as "Drew" and "Terry," informed Plaintiff Rasul that they were going to begin military tribunals.

109.     After continued interrogations as to his alleged presence in a photograph with Osama Bin Laden, Plaintiff Rasul explained that he was working in England and going to college at the time the photograph was taken.  Plaintiff Rasul told interrogators his place of employment at an English electronics shop and his attendance at University of Central England and implored interrogators to corroborate what he was telling them. The interrogators insisted he was lying.  To Plaintiff's knowledge, no effort was made to find corroborating information which would have confirmed that Plaintiff Rasul was living in England at the time of the alleged meeting with Bin Laden in the photograph.

110.     About a month after his second isolation period, Plaintiff Rasul was "long shackled" and placed in a room, where he was met by Bashir and a woman dressed in civilian clothing.  Bashir informed Plaintiff Rasul that the woman had come from Washington to show him a video of an Osama Bin Laden rally in Afghanistan.  After the woman showed Plaintiff Rasul a portion of the video, she asserted that it showed Plaintiffs Rasul, Iqbal and Ahmed sitting down with Bin Laden.  The woman interrogator urged Plaintiff Rasul to admit that the allegation was true, but the persons in the video were not the Plaintiffs.  Plaintiff Rasul continued truthfully to deny involvement.  He was threatened that if he did not confess, he would be returned to isolation.  Having been in isolation for five to six weeks, with the result that he was suffering from extreme mental anguish and disorientation, Plaintiff falsely confessed that he was in the video.

111.     Plaintiff Rasul was then returned to isolation for another five to six weeks. During that period he had no contact with any human being except with guards and

interrogators who questioned him regarding the identity of certain individuals in photographs.

112.    Plaintiff Rasul was then transferred to another cellblock, where both Plaintiffs Iqbal and Ahmed were being held. Here, Plaintiff Rasul was denied "comfort items" and exercise privileges.

113.    Around mid-August of 2003, Plaintiff Rasul was moved within Camp Delta and placed in another cell block without explanation. After about two weeks, Plaintiff Rasul was taken to a building known as the "Brown Building" and was informed by an army intelligence interrogator named "James" that he would soon be moving to a cell next to Plaintiffs Iqbal and Ahmed.

114.    Following the meeting with the army intelligence interrogator, Plaintiff Rasul was brought to "Kilo Block" the next day, where Plaintiffs Rasul, Iqbal and Ahmed were reunited and able to speak with one another.

115.    For the next two weeks, Plaintiffs Rasul, Iqbal and Ahmed were brought in succession to be questioned by an army intelligence officer, known only as "James," as to their purported involvement in the 2000 video of Bin Laden.

116.    On one occasion, Plaintiff Rasul was administered a voice stress analyzer test by "James."

117.    After his last interrogation by "James," Plaintiff Rasul was informed that he would soon be turned over to Navy Intelligence. Before that, however, in September 2003, Plaintiff Rasul was further interrogated. He was brought into an interrogation room for eight hours. He was denied requests to pray and to have food or water. The following day, British officials questioned Plaintiff Rasul. Plaintiff Rasul informed an official, who gave the name "Martin," that he had been kept in isolation for three months

without cause and had severe knee pain from the lack of exercise. Later that evening, Plaintiffs Rasul, Iqbal and Ahmed were taken to what was, on information and belief, a CIA interrogation block.

118. Plaintiffs continued to be held in the Kilo Block and were occasionally brought in for interrogation by a navy intelligence officer who gave the name "Romeo."

119. Plaintiff Iqbal was treated in a manner similar to the other Plaintiffs.

120. Plaintiff Iqbal was interrogated on several occasions, sometimes for as long as eight hours.

121. The typical routine was to be "short shackled" and placed in an extremely cold room.

122. Plaintiff Iqbal was relegated to Level 4, the harshest level, for about two weeks, with virtually no "comfort items." Soon after, he was placed in isolation on the instruction of intelligence officers.

123. Plaintiff Iqbal's isolation cell was covered in human excrement. Plaintiff Iqbal had no soap or towels and could not clean the cell. He was unable to sit anywhere.

124. Plaintiff Iqbal was interrogated periodically to review photographs. On one occasion, he was placed in a "short shackled" position and left in a room with the air conditioning turned down to 40°. Plaintiff Iqbal was left in the "short shackle" position for about three hours. Then, Defendant John Doe, an interrogator calling himself "Mr. Smith," entered the room and teased Plaintiff Iqbal about the temperature. "Mr. Smith" told Plaintiff Iqbal that he was able to get anything Plaintiff Iqbal wanted. "Mr. Smith" then pulled out pornographic magazines and taunted him. Plaintiff Iqbal refused to talk to "Mr. Smith." "Mr. Smith" left Plaintiff Iqbal alone for another three or four hours in the

frigid room. In that one day, Plaintiff Iqbal had been "short shackled" for seven to eight hours. Upon returning to his cell, he became ill with flu and requested medication. One of the military police officers, Defendant John Doe, denied him medication, and informed him that he was acting under orders from intelligence.

125.    The next day, a Marine Captain and about 15 soldiers escorted Plaintiff Iqbal to another isolation block.   He was left there for several days. Prior to his interrogation, Plaintiff Iqbal was "short shackled" and then introduced to an interrogator who gave the name "James".    Because the pain from the shackling became excruciating, Plaintiff Iqbal began to scream. After about three or four hours, "James" unshackled him.

126.    After three days, Plaintiff Iqbal was taken to the "Brown Building," where he was "long shackled" and left in a room with strobe lighting and very loud music played repeatedly, making it impossible for him to think or sleep. After about an hour, Plaintiff Iqbal was taken back to his cell.

127.    The next day, Plaintiff Iqbal was "short shackled" in the interrogation room for five or six hours before later being interrogated by "Drew," who identified himself as an agent from CID. Plaintiff Iqbal was shown photographs, but refused to look at them. He was "short shackled" for about four or five hours more. After a while, he was unable to bear the conditions and falsely confessed that he was pictured in the photographs.

128.    Four days later, agents from the FBI interrogated Plaintiff Iqbal about his activities in 2000.

129.    Plaintiff Iqbal remained in isolation and was questioned at one point by a military intelligence officer giving the name of "OJ." Soldiers threatened him with further beatings if he did not answer the questions.

130.     Plaintiff Ahmed was interrogated on numerous occasions, particularly with respect to his knowledge of the Bin Laden video. He was interrogated every three or four days, and the typical procedure was that he was first "short shackled" and placed in a freezing room with loud music for several hours.

131.     Before arriving at Guantánamo, Plaintiff Ahmed was seriously sleep-deprived and malnourished. He was the first of the Plaintiffs to admit to various false accusations by interrogators.

132.     Upon Plaintiff Ahmed's arrival at Camp Delta, he was placed in isolation for about one month. Following this period, he was placed in a different cell and interrogated by mostly American interrogators who asked him the same questions for six months.

133.     Plaintiff Al-Harith also was given a lie detector test approximately one year into his detention which he was told he passed.

134.     Plaintiff Al-Harith on three or four occasions witnessed Defendant John Does, military police, using an industrial strength hose to shoot strong jets of water at detainees. He was hosed down on one occasion. A guard walked along the gangway alternating the hose on each cell. Plaintiff Al-Harith was hosed down continuously for approximately one minute. The pressure of the water forced him to the back of his cell. The contents of his cell, including his bedding and Koran, were soaked.

135.     Plaintiff Rasul, in the next cell, also had all the contents of his cell soaked.

136.     In or around February 2004, Plaintiffs heard from military police that they would be released and sent home soon. Before leaving Camp Delta, Plaintiffs all were interrogated a final time. Plaintiffs were asked to sign statements admitting to membership in Al Qaeda and participation in terrorist activity. Plaintiffs declined.

137.    In March 2004, Plaintiffs were released from Camp Delta and flown to the United Kingdom.

## Injuries

138.    Plaintiffs suffered and continue to suffer from the cruel, inhuman, and degrading treatment they experienced during their detention.  The "short shackling" which Plaintiffs were exposed to resulted in deep cuts at their ankles, permanent scarring, and chronic pain.  Plaintiff Rasul has chronic pain in his knees and back. Plaintiff Ahmed also suffers from permanent deterioration of his eyesight because of the withholding of required special lenses as "comfort items."

139.    Plaintiff Al-Harith suffers from severe and chronic pain in his knees from repeatedly being forced onto his knees and pressed downwards by guards whenever he left his cell. He also has experienced pain in his right elbow.

140.    Plaintiffs further suffer from acute psychological symptoms.

## Development and Implementation of a Plan of Torture and Other Physical and Psychological Mistreatment of Detainees

141.    The torture, threats, physical and psychological abuse inflicted upon Plaintiffs were devised, approved, and implemented by Defendant Rumsfeld and other Defendants in the military chain of command.  These techniques were intended as interrogation techniques to be used on detainees.

142.    It is well-established that the use of force in interrogation is prohibited by domestic and international law.  The United States Army strictly prohibits the use of such techniques and advises its interrogators that their use may lead to criminal prosecution. Army Field Manual 34-52, Ch. 1, "Intelligence Interrogation," provides:

## Prohibition Against Use of Force

The use of force, mental torture, threats, insults, or exposure to unpleasant and inhumane treatment of any kind *is prohibited by law* and is neither authorized nor condoned by the US Government.... The psychological techniques and principles outlined should neither be confused with, nor construed to be synonymous with, unauthorized techniques such as brainwashing, mental torture, or any other form of mental coercion to include drugs. These techniques and principles are intended to serve as guides in obtaining the willing cooperation of a source. The absence of threats in interrogation is intentional, as their enforcement and use normally **constitute** *violations of international law and may result in prosecution.* (Emphasis supplied).

143.    Further, according to Field Manual 34-52, ch. 1: "Experience indicates that

the use of force is not necessary to gain the cooperation of sources for interrogation.

Therefore, the use of force is a poor technique, as it yields unreliable results, may

damage subsequent collection efforts, and can induce the source to say whatever he

thinks the interrogator wants to hear."

144.    Army Field Manual 27-10, "The Law of Land Warfare," summarizes the

domestic and international legal rules applicable to the conduct of war.  Field Manual

27-10 recognizes the following sources of the law of war:

The law of war is derived from two principal sources:

a.    *Lawmaking Treaties (or Conventions)*, such as the Hague and Geneva Conventions.
b.    *Custom.* Although some of the law of war has not been incorporated in any treaty or convention to which the United States is a party, this body of unwritten or customary law is firmly established by the custom of nations and well defined by recognized authorities on international law.

Id. at Ch. 1, § I.

145.    In spite of the prohibitions on the use of force, threats, and abuse in

the Army Field Manual, and its clear acknowledgement that their use violates

international and domestic law, Defendant Rumsfeld approved techniques that were in violation of those prohibitions and thus knowingly violated the rights of Plaintiffs.

146.    In a press release dated June 22, 2004, Defendant Rumsfeld admitted that beginning December 2, 2002, he personally authorized the use of interrogation techniques that are not permitted under FM 34-52.  Further, in the press release, Defendant Rumsfeld admits that he personally was consulted when certain of the techniques were to be utilized.

147.    The techniques practiced on Plaintiffs – including beatings, "short shackling," sleep deprivation, injections of unknown substances, subjection to cold or heat, hooding, stress positions, isolation, forced shaving, disruption of religious practices, forced nakedness, intimidation with vicious dogs and threats – were known to and approved by Defendant Rumsfeld and others in the military chain of command.

148.    Article 3 common to all four Geneva Conventions requires that all persons in the hands of an opposing force, regardless of their legal status, be afforded certain minimum standards of treatment:

> Persons taking no active part in the hostilities, including members of armed forces who have laid down their arms and those placed hors de combat by sickness, wounds, detention, or any other cause, shall in all circumstances be treated humanely, without any adverse distinction founded on race, colour, religion or faith, sex, birth or wealth, or any other similar criteria.
> To this end the following acts are and shall remain prohibited at any time and in any place whatsoever with respect to the above-mentioned persons:
>
> (a)    Violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture;
>
> * * * * *
> (c)    Outrages upon personal dignity, in particular, humiliating and degrading treatment.

149.    The Third Geneva Convention of 1949, Art. 130, bars the "willful killing, torture or inhuman treatment . . . willfully causing great suffering or serious injury to body or health" of any prisoner of war.

150.    In February 2002, the White House issued a press release, which advised:

> The United States is treating and will continue to treat all of the individuals detained at Guantánamo humanely and, to the extent appropriate and consistent with military necessity, in a manner consistent with the principles of the Third Geneva Convention of 1949.
>
> The President has determined that the Geneva Convention applies to the Taliban detainees, but not to the al-Qaeda detainees. Al-Qaeda is not a state party to the Geneva Convention; it is a foreign terrorist group. As such, its members are not entitled to POW status.

151.    On information and belief, Defendant Rumsfeld and all Defendants were aware of this statement of the President.  Moreover, Defendant Rumsfeld knew that this statement of policy was a departure from the previous policy of the United States that the laws of war, including the Geneva Conventions, were always to be honored.  Defendant Rumsfeld knew that the Department of State and the uniformed services took the generally recognized position that the Geneva Conventions could not be abrogated or ignored.

152.    However, Defendant Rumsfeld and others deliberated failed to implement the Presidential Directive in any event. Defendant Rumsfeld and other Defendants in the chain of command had no good faith basis for believing that Plaintiffs were members of or affiliated with Al Qaeda in any way. Indeed, the policy as announced was incoherent in that Defendant Rumsfeld and the other defendants had no way of knowing who was and who was not a member of Al Qaeda or the

Taliban and Defendants took no steps to implement any reliable fact-finding process which might ascertain who was and who was not a member of Al Qaeda or the Taliban, including in particular a "competent tribunal" as mandated by the Third Geneva Convention, Art. 5, U.S. military regulations and long standing practice of the U.S. armed forces

153.    Defendant Rumsfeld and all Defendants were aware that torture and other mistreatment perpetrated under color of law violates domestic and international law at.

154.    Defendant Rumsfeld and all Defendants were aware that Plaintiffs were tortured and otherwise mistreated or knew they would be tortured and otherwise mistreated while in military custody in Afghanistan and at Guantánamo.

155.    Defendant Rumsfeld and all Defendants took no steps to prevent the infliction of torture and other mistreatment to which Plaintiffs were subjected.

156.    Defendant Rumsfeld and all Defendants authorized and encouraged the infliction of torture and other mistreatment against Plaintiffs.

157.    Defendant Rumsfeld and all Defendants were aware that prolonged arbitrary detention violates customary international law.

158.    Defendant Rumsfeld and all Defendants authorized and condoned the prolonged arbitrary detention of Plaintiffs.

**Count I**
**ALIEN TORT STATUTE**
**Prolonged Arbitrary Detention**

159.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 158 of this Complaint as if fully set forth herein.

160.    As stated by the Supreme Court of the United States, the allegations contained herein "unquestionably describe 'custody in violation of the Constitution or laws or treaties of the United States.'" Rasul v. Bush, 124 S. Ct. 2686, 2698, n.15 (2004) (citation omitted) (Plaintiffs Rhuhel Ahmed and Asif Iqbal were also Plaintiffs in that case).

161.    Plaintiffs Rasul, Iqbal and Ahmed were unarmed and were detained in a prison camp operated by non-U.S. forces and Plaintiff Al-Harith had been detained and mistreated by the Taliban as a suspected British spy and was trapped in a war zone when Defendants took physical custody of their persons.  Plaintiffs never engaged in combat, carried arms, or participated in terrorist activity or conspired with any terrorist person or organization.  Defendants could have had no good-faith reason to believe that they had done so.

162.    The Plaintiffs were detained under the exclusive custody and control of Defendants for over two years without due process, access to counsel or family, or a single charge of wrongdoing being levied against them.

163.    The acts described herein constitute prolonged arbitrary detention in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. §1350, in that the acts violated customary international law prohibiting prolonged arbitrary detention as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

164.    Defendants are liable for said conduct in that Defendants participated in, set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified, aided and abetted and/or conspired together in bringing about the prolonged arbitrary detention of Plaintiffs.

165.    Defendant's unlawful conduct deprived Plaintiffs of their freedom, of contact with their families, friends and communities.  As a result, Plaintiffs suffered severe psychological abuse and injuries.

166.    Plaintiffs are entitled to monetary damages and other relief to be determined at trial.

### Count II
### ALIEN TORT STATUTE
### Torture

167.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 158 of this Complaint as if fully set forth herein.

168.    The acts described herein were inflicted deliberately and intentionally for purposes which included, among others, punishing the Plaintiffs or intimidating them. The alleged acts did not serve any legitimate intelligence-gathering or other government purpose.  Instead, they were perpetrated to coerce, punish, and intimidate the Plaintiffs. In any event, torture is not permitted as a legitimate government function under any circumstances.

169.    The acts described herein constitute torture in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting torture as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions and other authorities.

170.    Defendants are liable for said conduct in that Defendants participated in, set the conditions, directly and/or indirectly facilitated, ordered acquiesced, confirmed, ratified and or/conspired together in bringing about the torture and other physical and psychological abuse of Plaintiffs as described above.

171.    Plaintiffs suffered severe, immediate and continuing physical and psychological abuse as a result of the acts alleged herein.  Plaintiffs continue to suffer profound physical and psychological trauma from the acts alleged herein.

172.    Plaintiffs are entitled to monetary damages and other relief to be determined at trial.

**Count III**
**ALIEN TORT STATUTE**
**Cruel, Inhuman or Degrading Treatment**

173.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 158 of this Complaint as if fully set forth herein.

174.    The acts described herein had the intent and the effect of grossly humiliating and debasing the Plaintiffs, forcing them to act against their will and conscience, inciting fear and anguish, and breaking their physical and moral resistance.

175.    These acts included inter alia repeated severe beatings; the withholding of food, water, and necessary medical care; sleep deprivation; lack of basic hygiene; intentional exposure to extremes of heat and cold and the elements; continuous isolation for a period of months; forced injections; sexual humiliation; intimidation with unmuzzled dogs; deprivation of the rights to practice their religion and death threats.

176.    The acts described herein constitute cruel, inhuman or degrading treatment in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting cruel, inhuman or degrading treatment as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions and other authorities.

177.    Defendants are liable for said conduct in that Defendants participated in, set the conditions, directly and/or indirectly facilitated, ordered acquiesced, confirmed, ratified, aided and abetted and/or conspired together in bringing about the cruel, inhuman or degrading treatment of Plaintiffs as described above.

178.    Plaintiffs suffered severe immediate physical and psychological abuse as a result of the acts alleged herein.  Plaintiffs continue to suffer profound physical and psychological trauma from the acts alleged herein.

179.    Plaintiffs are entitled to monetary damages and other relief to be determined at trial.

### Count IV
### VIOLATION OF THE GENEVA CONVENTIONS

180.    Plaintiffs repeat and re allege the allegations contained in paragraphs 1 through 158 of this Complaint as if fully set forth herein.

181.    As detailed herein, Plaintiffs were held arbitrarily, tortured and otherwise mistreated during their detention in violation of specific protections of the Third and Fourth Geneva Conventions including but not limited to Article 3 common to all four Geneva Conventions.

182.    Violations of the Geneva Conventions are direct treaty violations as well as violations of customary international law.

183.    Defendants are liable for said conduct in that Defendants participated in, set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified, aided and abetted and/or conspired together in bringing about the prolonged arbitrary detention, torture, abuse and mistreatment of Plaintiffs as described above.

184.    As a result of Defendants' violations of the Geneva Conventions, Plaintiffs are entitled to monetary damages and other relief to be determined at trial.

### Count V
### CLAIMS UNDER THE CONSTITUTION OF THE UNITED STATES
### Violation of the Eighth Amendment

185.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 thorugh 158 of this Complaint as if fully set forth herein.

186.    Defendants' actions alleged herein against imprisoned Plaintiffs violated the Eighth Amendment to the United States Constitution.   Over the course of an arbitrary and baseless incarceration for more than two years, Defendants inflicted cruel and unusual punishment on Plaintiffs.  Despite never having been tried by any tribunal, Plaintiffs and other detainees were repeatedly denounced as guilty of terrorist acts by Defendant Rumsfeld, President Bush, Vice President Cheney and others. The acts of cruel, inhuman or degrading unusual punishment were imposed based on this arbitrary and impermissible declaration of guilt.

187.    Defendants were acting under color of law of the United States at all times pertinent to the allegations set forth above.

188.    The Plaintiffs suffered severe physical and mental injuries as a result of Defendants' violations of the Eighth Amendment.  They have also suffered present and future economic damage.

189.    The actions of Defendants are actionable under Bivens v. Six Unknown Named Federal Agents, 403 U.S. 388 (1971).

190.    Defendants are liable for said conduct in that Defendants participated in, set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified, aided and abetted and/or conspired together in bringing about the prolonged

arbitrary detention, physical and psychological torture and abuse, and other mistreatment of Plaintiffs as described above.

191.     Plaintiffs are entitled to monetary damages and other relief to be determined at trial.

**Count VI**
**CLAIMS UNDER THE CONSTITUTION OF THE UNITED STATES**
**Violation of the Fifth Amendment**

192.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 158 of this Complaint as if fully set forth herein.

193.     Defendants' actions alleged herein against Plaintiffs violated the Fifth Amendment to the United States Constitution.

194.     The arbitrary and baseless detention of Plaintiffs for more than two years constituted a clear deprivation of their liberty without due process, in direct violation of their Fifth Amendment rights.

195.     The cruel, inhuman or degrading, and unusual conditions of Plaintiffs' incarceration clearly violated their substantive rights to due process.  See City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983).

196.     Defendants' refusal to permit Plaintiffs to consult with counsel or to have access to neutral tribunals to challenge the fact and conditions of their confinement constituted violations of Plaintiffs' procedural rights to due process.

197.     The abusive conditions of Plaintiffs' incarceration served no legitimate government purpose.

198.     Defendants were acting under the color of the law of the United States at all times pertinent to the allegations set forth above.

199.    The Plaintiffs suffered severe physical and mental injuries as a result of Defendants' violations of the Fifth Amendment.  They have also suffered present and future economic damage.

200.    The actions of Defendants are actionable under <u>Bivens v. Six Unknown Named Federal Agents</u>, 403 U.S. 388 (1971).

201.    Defendants are liable for said conduct in that Defendants participated in, set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified, aided and abetted and/or conspired together in bringing about the prolonged arbitrary detention, physical and psychological torture and abuse and other mistreatment of Plaintiffs as described above.

202.    Plaintiffs are entitled to monetary damages and other relief to be determined at trial.

### Count VII
### CLAIM UNDER THE RELIGIOUS FREEDOM RESTORATION ACT

203.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 158 of this Complaint as if fully set forth herein.

204.    Defendants' actions alleged herein inhibited and constrained religiously motivated conduct central to Plaintiffs' religious beliefs.

205.    Defendants' actions imposed a substantial burden on Plaintiffs' abilities to exercise and express their religious beliefs.

206.    Defendants regularly and systematically engaged in practices specifically aimed at disrupting Plaintiffs' religious practices.  These acts included throwing a copy of the Koran in a toilet bucket, prohibiting prayer, deliberately interrupting prayers, playing loud rock music to interrupt prayers, withholding the Koran without reason or as

punishment, forcing prisoners to pray with exposed genital areas, withholding prayer mats and confining Plaintiffs under conditions where it was impossible or infeasible for them to exercise their religious rights.

207.   Defendants were acting under the color of the law of the United States at all times pertinent to the allegations set forth above.

208.   The Plaintiffs suffered damages as a direct and proximate result of Defendants' violations of the Religious Freedom Restoration Act, 42 U.S.C.A §§ 2000bb et seq.

209.   Defendants are liable for said conduct in that Defendants participated in, set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified, aided and abetted and/or conspired together in bringing about the denial, disruption and interference with Plaintiffs' religious practices and beliefs as described above.

210.   Plaintiffs are entitled to monetary damages and other relief to be determined at trial.

WHEREFORE Plaintiffs each demand judgment against Defendants jointly and severally, including compensatory damages in the amount of $10,000,000 each (Ten Million Dollars), punitive damages, the costs of this action, including reasonable attorneys' fees, and such other and further relief as this Court may deem just and proper.

Dated:   October 27, 2004

BAACH ROBINSON & LEWIS
Eric L. Lewis D.C. Bar No. 394643
Jeffrey D. Robinson D.C. Bar No.376037
Lois J. Schiffer D.C. Bar. No. 56630
1201 F Street NW, Suite 500
Washington, D.C. 20004
202/833-8900

Barbara Olshansky (NY 0057)
Jeffrey Fogel
Michael Ratner
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY, 20012
212/614-6439

Attorneys for Plaintiffs