**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SHAFIQ RASUL *et al.*,                                :
                                                       :
                        Plaintiffs,            :        Civil Action No.:        04-1864 (RMU)
                                                       :
                        v.                     :        Document No.:            8
                                                       :
DONALD RUMSFELD *et al.*,                  :
                                                       :
                        Defendants.            :

**MEMORANDUM OPINION**

**GRANTING IN PART AND DEFERRING RULING IN
PART ON THE DEFENDANTS' MOTION TO DISMISS**

**I.   INTRODUCTION**

On September 11, 2001, this nation experienced the worst terrorist attacks in its history.

The September 11 attacks claimed over 3,000 American lives and severely undermined this

nation's sense of security.  The actions of the terrorist perpetrators, fueled by ignorance and

intolerance, launched this nation's quest to identify, apprehend and bring to justice terrorist

criminals who threaten this country.  The plaintiffs herein, former detainees at the United States

Naval Station at Guantanamo Bay, Cuba ("GTMO" or "Guantanamo"), now petition this court

for relief alleging acts which recast the roles of victim and wrongdoer.  These allegations assert

various forms of torture, which include hooding, forced nakedness, housing in cages, deprivation

of food, forced body cavity searches, subjection to extremes of heat and cold, harassment in the

practice of their religion, forced shaving of religious beards, placing the Koran in the toilet,

placement in stress positions, beatings with rifle butts, and the use of unmuzzled dogs for

intimidation.  Most disturbing, however, is their claim that executive members of the United

States government are directly responsible for the depraved conduct the plaintiffs suffered over

the course of their detention.  In essence, the plaintiffs assert that their captors became the beasts they sought to suppress.[1]

Currently before the court is the defendants' motion to dismiss for lack of subject-matter jurisdiction and failure to state a claim on which relief can be granted.  Because the defendants are immune from claims arising under international law, the court substitutes the United States as a defendant for these claims in place of the individual defendants.  Because the plaintiffs have not exhausted their administrative remedies by bringing their international law claims to an appropriate Federal agency, the court dismisses those claims.  Because the defendants are entitled to qualified immunity from the plaintiffs' constitutional claims, the court dismisses those claims.  Lastly, although the Religious Freedom Restoration Act may apply to United States action in Guantanamo Bay, the court considers the parties' briefing on this issue and the applicability of the doctrine of qualified immunity inadequate.  Accordingly, the court defers ruling on the defendants' motion to dismiss as to this claim pending further briefing by the parties.

## II.   BACKGROUND

**The plaintiffs allege the following**:

In the months immediately following the September 11 attacks on America, the plaintiffs, all citizens of the United Kingdom, were in Afghanistan conducting humanitarian relief and

---

[1]   "It would indeed be ironic if, in the name of national defense, we would sanction the subversion of one of those liberties . . . which makes the defense of the Nation worthwhile."  *United States v. Robel*, 389 U.S. 258, 264 (1967).  As Mahatma Ghandi stated, "[w]hat difference does it make . . . whether the mad destruction is wrought under the name of totalitarianism or the holy name of liberty and democracy?"

trying to return to England.  Compl. ¶¶ 2-3, 35.  On November 28, 2001, an Uzbek warlord, General Rashid Dostum, captured three of the plaintiffs; Shafiq Rasul, Asif Iqbal, and Rhuhel Ahmed.  *Id*. ¶ 2.  One month later, General Dostum handed them over to the United States for a bounty.  *Id*. ¶¶ 2, 42-44.  After two weeks of suffering extensive abuse and interrogations under United States' custody, the military transported Rasul and Iqbal from Afghanistan to GTMO.  *Id*. ¶¶ 37-64.  Ahmed, however, stayed in Afghanistan for six weeks under United States custody, eventually succumbing to the pervasive interrogation techniques and falsely confessing to having ties with Al Qaeda.  *Id*. ¶ 62.  Only then, in February 2002, did the United States transport Ahmed to Guantanamo.  *Id*. ¶ 63.

The Taliban was the first to capture the fourth plaintiff, Jamal Al-Harith in Afghanistan. *Id*. ¶ 3.  The Taliban accused Al-Harith of being a British spy and tortured him.  *Id*.  When the Taliban fell, Al-Harith was released and immediately contacted the British embassy officials to coordinate his evacuation.  *Id*.  After a month of coordinating with British officials, United States forces detained him and, in February of 2002, transported him to GTMO.  *Id*. ¶¶ 3-4, 63.

Shortly before the plaintiffs' arrival in Guantanamo Bay in December 2002, defendant Donald Rumsfeld signed a memorandum approving more aggressive interrogation techniques that allegedly departed from the standards of care normally afforded military prisoners.  *Id*. ¶ 9. Some of these previously prohibited techniques includes forcing the prisoners to endure stress-positions for up to four consecutive hours, disrobing prisoners, intimidating prisoners with dogs, twenty-hour interrogation sessions, forcing prisoners to wear hoods, shaving their hair, isolating the prisoners in total darkness and silence, and using physical contact.  *Id*.  In April 2003, Rumsfeld withdrew approval of these tactics.  *Id*. ¶¶ 10-11.

Following this revocation, however, the detainees at GTMO continued to suffer from inhumane treatment. *Id*. ¶¶ 65-158.  During the United States' detainment of the plaintiffs at GTMO, which has lasted over two years, the plaintiffs suffered repeated beatings and forced body cavity searches. *Id*. ¶¶ 4, 6.  Furthermore, prison guards frequently shackled the plaintiffs for many hours, causing wounds and permanent scarring, and also forced them to remain in stressful positions for hours, injected unknown substances into their bodies, and required them to live in cramped cages without protection from the elements. *Id*. ¶¶ 6, 70, 72, 85.  In addition, the guards deprived the plaintiffs of adequate food, sleep, and communication with family members. *Id*. ¶ 6.  The guards also humiliated and harassed the plaintiffs as they tried to practice their religion. *Id*.  After months of extreme hardship and relentless interrogations, Rasul and Iqbal relented and confessed (falsely) to having ties with Al Qaeda. *Id*. ¶¶ 110, 127.  Despite their confessions, after more than two years in United States custody without having any charges brought against them, in March of 2004, the United States released all of the plaintiffs, and they returned to their homes in the United Kingdom. *Id*. ¶ 137.

The plaintiffs filed the instant case against various military officials on October 27,

2004.[2]  On March 16, 2005, the defendants filed a motion to dismiss for lack of subject matter

jurisdiction and failure to state a claim pursuant to the Federal Rules of Civil Procedure 12(b)(1)

and (6).  The court turns to the defendants' motion.

### III.   ANALYSIS

### A.   Legal Standards

### 1.   Legal Standard for a 12(b)(1) Motion to Dismiss

Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies

outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377

(1994); *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288-89 (1938); *see also Gen.*

*Motors Corp. v. Envtl. Prot. Agency*, 363 F.3d 442, 448 (D.C. Cir. 2004) (noting that "[a]s a

court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction").

Because "subject-matter jurisdiction is an 'Art. III as well as a statutory requirement[,] no

action of the parties can confer subject-matter jurisdiction upon a federal court.'" *Akinseye v.*

*District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003) (quoting *Ins. Corp. of Ir., Ltd. v.*

---

[2]      The defendants are Donald Rumsfeld, Secretary of Defense; Air Force General Richard Myers, Former Chairman of the Joint Chiefs of Staff; Air Army Major General Geoffrey Miller, Former Commander of the Joint Task Force at Guantanamo Bay Naval Base; Army General James Hill, Commander of the United States Southern Command; Army Major General Michael Dunlavey, Former Commander of the Joint Task Force at Guantanamo Bay Naval Base; Army Brigadier General Jay Hood, Commander of the Joint Task Force at Guantanamo Bay Naval Base; Marine Brigadier General Michael Lehnert, Commander of the Joint Task Force-160 at Guantanamo Bay Naval Base; Army Colonel Nelson Cannon, Commander at Camp Delta at Guantanamo Bay Naval Base; Army Colonel Terry Carrico, Commander of Camp X-Ray-Camp Delta at Guantanamo Bay Naval Base; Army Lieutenant Colonel William Cline, Commander of Camp Delta at Guantanamo Bay Naval Base; Army Lieutenant Colonel Diane Beaver, Legal Advisor to General Dunlevey; and John Does 1-100.  *See* Compl.

*Compagnie des Bauxite de Guinea*, 456 U.S. 694, 702 (1982)).  On a motion to dismiss for lack

of subject-matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of

establishing that the court has subject-matter jurisdiction.  *Lujan v. Defenders of Wildlife*, 504

U.S. 555, 561 (1992).  The court may dismiss a complaint for lack of subject-matter jurisdiction

only if "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his

claim which would entitle him to relief.'"  *Empagran S.A. v. F. Hoffman-Laroche, Ltd.*, 315 F.3d

338, 343 (D.C. Cir. 2003) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

Because subject-matter jurisdiction focuses on the court's power to hear the claim,

however, the court must give the plaintiff's factual allegations closer scrutiny when resolving a

Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion for failure to state a

claim.  *Macharia v. United States*, 334 F.3d 61, 64, 69 (D.C. Cir. 2003); *Grand Lodge of*

*Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).  Moreover, the court

is not limited to the allegations contained in the complaint.  *Hohri v. United States*, 782 F.2d 227,

241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987).  Instead, to determine

whether it has jurisdiction over the claim, the court may consider materials outside the pleadings.

*Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).

## 2.    Legal Standard for a 12(b)(6) Motion to Dismiss

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a complaint.  *Browning v.*

*Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  The complaint need only set forth a short and plain

statement of the claim, giving the defendant fair notice of the claim and the grounds upon which

it rests.  *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1040 (D.C. Cir. 2003) (citing

Fed R. Civ. P. 8(a)(2) and *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  "Such simplified notice

pleading is made possible by the liberal opportunity for discovery and the other pre-trial

procedures established by the Rules to disclose more precisely the basis of both claim and

defense to define more narrowly the disputed facts and issues." *Conley*, 355 U.S. at 47-48

(internal quotation marks omitted).  It is not necessary for the plaintiff to plead all elements of his

prima facie case in the complaint, *Swierkiewicz v. Sonoma N.A.*, 534 U.S. 506, 511-14 (2002), or

"plead law or match facts to every element of a legal theory," *Krieger v. Fadely*, 211 F.3d 134,

136 (D.C. Cir. 2000) (internal quotation marks and citation omitted).

     Accordingly, "the accepted rule in every type of case" is that a court should not dismiss a

complaint for failure to state a claim unless the defendant can show beyond doubt that the

plaintiff can prove no set of facts in support of his claim that would entitle him to relief.  *Warren*

*v. Dist. of Columbia*, 353 F.3d 36, 37 (D.C. Cir. 2004); *Kingman Park*, 348 F.3d at 1040.  Thus,

in resolving a Rule 12(b)(6) motion, the court must treat the complaint's factual allegations –

including mixed questions of law and fact – as true and draw all reasonable inferences therefrom

in the plaintiff's favor.  *Macharia v. United States*, 334 F.3d 61, 64, 67 (D.C. Cir. 2003); *Holy*

*Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003); *Browning*, 292

F.3d at 242.  While many well-pleaded complaints are conclusory, the court need not accept as

true inferences unsupported by facts set out in the complaint or legal conclusions cast as factual

allegations.  *Warren*, 353 F.3d at 39; *Browning*, 292 F.3d at 242.

## B.   The Court Grants the Defendants' Motion to
## Dismiss the International Law Claims

The plaintiffs bring three actions against the defendants for alleged violations of the law

of nations, and one action for alleged violations of the Geneva Conventions.[3]  Compl. ¶¶ 159-84.

Specifically, the plaintiffs allege that they were subjected to prolonged arbitrary detention, *id.* ¶

159-166, torture, *id.* ¶ 167-172, and cruel, inhumane, and degrading treatment, *id.* ¶ 173-179.

The Attorney General's designee, however, certified that the defendants were acting

within the scope of their employment "at the time of the conduct alleged in the complaint."

Defs.' Mot. to Dismiss ("Defs.' Mot."), Ex. 1.  Because of this certification, the defendants argue

that the plaintiffs' claims are barred by the Federal Employees Liability Reform and Tort

Compensation Act of 1988 (the "Westfall Act"), 28 U.S.C. § 2679, which directs that the Federal

Torts Claims Act ("FTCA") provides the exclusive remedy for tortious conduct committed by

government employees acting within the scope of their employment.  Defs.' Mot. at 4; 28 U.S.C.

§ 2679(b)(1).

The plaintiffs, however, contend that as a matter of law, the defendants were not acting

within the scope of their employment, Pls.' Opp'n at 8-13, or alternatively, that the entirety of

their claims fall within either of the two exceptions to the exclusive remedy provision of the

FTCA.  Pls.' Opp'n at 18.  As discussed below, the plaintiffs' claims against the defendants

---

[3]   The plaintiffs invoke the Alien Torts Statute, 28 U.S.C. § 1350, as the jurisdictional basis for their suit.  Compl. ¶¶ 159-84.  That statute provides, *inter alia*, that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. § 1350.

under customary international law and the Geneva Conventions[4] are barred by the Westfall Act.

For this reason, the court substitutes the United States as a defendant for these claims and

dismisses them for the plaintiffs' failure to exhaust their administrative remedies.

### 1.   The Westfall Act Requires that the Court Substitute the United States as a Defendant in Place of the Individual Defendants.

#### a.   Legal Standard for Immunity of Federal Officers Under the Westfall Act

The Westfall Act confers immunity on federal employees "by making an FTCA action

against the Government the exclusive remedy for torts committed by Government employees in

the scope of their employment." *United States v. Smith*, 499 U.S. 160, 163 (1991); 28 U.S.C. §

2679(b)(1).  The Act provides:

> Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.

28 U.S.C. § 2679(d)(1).  In a case where the Attorney General, or by designation the United

States Attorney in the district where the claim is brought, files a certification that the original

defendant was acting within the scope of his employment, such certification has the following

consequences: (1) if the suit originated in state court, then the Attorney General or his designee is

required to remove it to federal court; (2) the United States shall be substituted as the sole

---

[4]    The plaintiffs argue that the Geneva Conventions are enforceable by the plaintiffs.  Pls.' Opp'n at 25.  Since the parties submitted their briefs to the court, however, the D.C. Circuit has ruled that the Geneva Conventions do not incorporate a private right to enforce its provisions in court.  *Hamdan v. Rumsfeld*, 415 F.3d 33, 40 (D.C. Cir. 2005), *cert. granted*, 126 S. Ct. 622.  Thus, the Geneva Conventions do not give the plaintiffs an independent vehicle for their lawsuit.

defendant; and (3) if the plaintiff has not brought suit pursuant to the FTCA, the suit converts to one against the United States under the FTCA.  28 U.S.C. § 2679(d)(2); 28 C.F.R. § 15.3(a) (2002); *Haddon v. United States*, 68 F.3d 1420, 1423 (D.C. Cir. 1995).  The certification is conclusive for purposes of removal.  The substitution and conversion consequences, however, are subject to judicial review; that is, they are contingent on whether the court finds that the original defendant acted within the scope of his employment.  *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 434 (1995) (stating that "[t]he Attorney General's certification that a federal employee was acting within the scope of his employment . . . does not conclusively establish as correct the substitution of the United States as defendant in place of the employee"); *Haddon*, 68 F.3d at 1423 (noting that "the federal court may determine independently whether the employee acted within the scope of employment and, therefore, whether to substitute the federal government as the proper defendant").

When the court reviews the validity of a certification filed by the Attorney General or his designee, the certification is entitled to "*prima facie* effect" that the defendants acted within the scope of their employment.  *Kimbro v. Velten*, 30 F.3d 1501, 1509 (D.C. Cir. 1994) (internal citations omitted).  The burden then shifts to the plaintiffs to first allege facts that, if true, would exceed the scope of the defendants' employment.  *Stokes v. Cross*, 327 F.3d 1210, 1215 (D.C. Cir. 2003).  Upon allegations of such facts, the plaintiffs are entitled to discovery and evidentiary hearings to resolve material issues of fact.  *Id.*  However, the plaintiffs must still prove by a preponderance of the evidence that the defendants' actions were outside the scope of their employment for their claims to survive.  *Kimbro*, 30 F.3d at 1509; *Schneider v. Kissinger*, 310 F. Supp. 2d 251, 264 (D.D.C. 2004), *aff'd* 412 F.3d 190 (D.C. Cir. 2005); *Maron v. United States*,

126 F.3d 317, 322 (4th Cir. 1997) (applying identical factors to determine scope of employment).

To determine whether a federal employee was acting within the scope of his employment, a federal court must apply the law of the state where the tortious act occurred.  *Tarpeh-Doe v. United States*, 28 F.3d 120, 123 (D.C. Cir. 1994); *Garber v. United States*, 578 F.2d 414, 415 (D.C. Cir. 1978).  In this case, however, the alleged tortious acts occurred at GTMO.  Since Guantanamo does not provide adequate guidelines for determining scope of employment and the acts are "inextricably bound up with the District of Columbia in its role as the nation's capital[,]" the relevant law to apply is that of the District of Columbia.  *Mundy v. Weinberger*, 554 F. Supp. 811, 818 (D.D.C. 1982).  The law of the District of Columbia is drawn from the Restatement (Second) of Agency.  *Haddon*, 68 F.3d at 1423.  The Restatement provides that

> [c]onduct of a servant is within the scope of employment if, but only if: (1) it is of the kind he is employed to perform; (2) it occurs substantially within the authorized time and space limits; (3) it is actuated, at least in part, by a purpose to serve the master; and (4) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

RESTATEMENT (SECOND) OF AGENCY § 228 (1957); *Hechinger Co. v. Johnson*, 761 A.2d 15, 24 n.5 (D.C. 2000).

### b.   The Defendants Were Acting Within the Scope of their Employment[5]

### i.   Nature of the Conduct

To constitute action within the scope of one's employment, first, the conduct must be "of the same general nature as that authorized" or "incidental to the conduct authorized." RESTATEMENT (SECOND) OF AGENCY § 229 (1957).  The District of Columbia "liberally construes the doctrine of respondeat superior . . . with respect to the first prong of the Restatement (Second) of Agency § 228(1)."  *Stokes*, 327 F.3d at 1216 (citing *Haddon*, 68 F.2d at 1425-26 and *Weinberg v. Johnson*, 518 A.2d 985, 988-90 (D.C. 1986)).  It is undisputed that the named defendants initially acted pursuant to directives contained in a December 2, 2002 memorandum from defendant Rumsfeld.  Compl. ¶¶ 9, 10.  In April 2003, defendant Rumsfeld withdrew explicit authorization for use of torture.  *Id.* ¶ 11.  The plaintiff alleges that despite this removal of authorization to torture, the defendants persisted in utilizing these tactics.  *Id.*  For

---

[5]   As a threshold concern, the plaintiffs argue that violations of international law (specifically torture, cruel and degrading treatment, and prolonged arbitrary detention), as a matter of law, fall outside the scope of employment because they are contrary to the official position of the United States.  Pls.' Opp'n at 11 (citing a State Department report to the United Nations Committee Against Torture).  This argument is unavailing for three reasons.  First, Congress established a framework where state law, not State Department representations to the United Nations, governs the scope of employment determination.  28 U.S.C. § 2679(d)(2)-(3); *see also Haddon*, 68 F.3d 1420, 1424-25 (D.C. Cir. 1995) (applying District of Columbia law to determine federal employee's scope of employment under the FTCA).  Second, to the extent the Executive Branch can make legal representations to this court regarding the scope of an employee's conduct, they have done so through the Attorney General's certification.  *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 434 (1995).  Finally, "[d]efining an employee's scope of employment is not a judgment about whether alleged conduct is deleterious or actionable; rather, this procedure merely determines *who* may be held liable for that conduct, an employee or his boss."  *Schneider v. Kissinger*, 310 F. Supp. 2d 251, 265 (D.D.C. 2004) (emphasis in original), *aff'd* 412 F.3d 190 (D.C. Cir. 2005).  Accordingly, the court construes the scope of a government employees' employment by looking at the specific process detailed in the statute rather than by consulting State Department reports to the United Nations.

this reason, the crux of the dispute here is whether the defendants' actions after April 2003 were

"incidental to the conduct authorized."  RESTATEMENT (SECOND) OF AGENCY § 229.

Analyzing the meaning of "incidental conduct," the D.C. Circuit has stated:

[C]onduct is "incidental" to an employee's legitimate duties if it is "foreseeable."
"Foreseeable" in this context does not carry the same meaning as it does in
negligence cases; rather, it requires the court to determine whether it is fair to charge
employers with responsibility for the intentional torts of their employees.  To be
foreseeable, the torts must be "a direct outgrowth of the employee's instructions or
job assignment."  It is not enough that an employee's job provides an "opportunity"
to commit an intentional tort.

*Haddon*, 68 F.3d at 1424. (citations omitted).  The defendants argue that their actions were

incidental to the conduct authorized.  Defs.' Reply at 8.

The law of the District of Columbia supports the defendants' position.  The courts in the

District of Columbia categorize practically any conduct as falling within the scope of, or

incidental to, that authorized by their employer so long as the action has some nexus to the action

authorized.  For example, in *Weinberg v. Johnson*, the D.C. Court of Appeals ruled that a

laundromat employee's decision to shoot a customer over clothes which the employee had a duty

to remove from a laundry machine if left unattended constituted conduct done "in virtue of his

employment and in furtherance of its ends."  518 A.2d at 988 (internal quotations omitted)

(stating that the employer will be liable under the *respondeat superior* doctrine so long as the

employee's conduct does not include a "personal motive").  Applying this principle, the D.C.

Circuit ruled that a delivery person's sexual assault of a customer, following an argument over

inspecting and paying for the delivered goods, was incidental to his employment for a trucking

company.  *Lyon v. Carey*, 533 F.2d 649 (D.C. Cir. 1976) (stating that though "the assault was

perhaps at the outer bounds of respondeat superior . . . [i]t is within the enterprise liability of

vendors like furniture stores and those who deliver for them that deliverymen, endeavoring to serve their masters, are likely to be in situations of friction with customers" which may lead to "altercations" and "violence").

Here, the United States authorized military personnel in Guantanamo to exercise control over the detainees and question the detainees while in the custody of the United States. Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001); *Khalid v. Bush*, 355 F. Supp. 2d 311, 319 (D.D.C. 2005) (stating that through the Authorization for Use of Military Force, Congress "gave the President the power to capture and detain those who the military determined were either responsible for the 9/11 attacks or posed a threat of future terrorist attacks").[6] Like *Lyon* and *Weinberg*, the complaint points to actions which arose specifically from authorized activities. Additionally, the plaintiffs' complaint alleges torture and abuse tied exclusively to the plaintiffs' detention in a military prison and to the interrogations conducted therein. *See generally* Compl. If the doctrine of *respondeat superior* is panoptic enough to link sexual assault with a furniture deliveryman's employment because of the likely friction that may arise between deliveryman and customer, it must also include torture and inhumane treatment wrought upon captives by their captors. Stated differently, if "altercations" and "violence" are foreseeable consequences of a furniture deliveryman's employment, then torture is a foreseeable consequence of the military's detention of suspected enemy combatants. For these reasons, the court rules that the defendants' conduct was incidental to their roles as

---

[6]     The court notes that *Khalid v. Bush* is on appeal with the D.C. Circuit. *Khalid v. Bush*, 355 F. Supp. 2d 311 (D.D.C. 2005), *appeal docketed*, No. 05-5063 (D.C. Cir. notice of appeal March 2, 2005). The court cites *Khalid* solely to demonstrate that the defendants sued in this case were acting pursuant to a congressional authorization, not for that case's ultimate legal conclusions regarding the legality of the Authorization.

military officials.  Accordingly, the alleged activity of the defendants was "a direct outgrowth of the employees instructions [and] job assignment" and within the scope of their employment. *Haddon*, 68 F.3d at 1424 (citations omitted).

## ii.    Space and Time Limitations

Under the Restatement (Second) of Agency, the court's second line of inquiry concerns whether the defendants' actions took place within the space and time limitations authorized by the employer. Restatement (Second) of Agency § 228.  Because the parties do not dispute that the defendants' actions took place within the time and place limitations sanctions by the United States, Pls.' Opp'n at 9-10, the court proceeds to the third and fourth prongs of the scope of employment inquiry.

## iii.    The Purpose of the Conduct[7]

Next the court addresses whether the alleged actions were perpetrated, at least in part, to

---

[7]    The plaintiffs assert that the defendants' actions were, as a matter of law, outside the scope of their employment because they were not "legitimate executive acts." Pls.' Opp'n at 12.  The plaintiffs fail to adequately explain why all actions within a federal employee's scope of employment must be "legitimate executive acts" but rather make vague analogies to "foreign tyrants seeking to avoid liability in U.S. courts." *Id.*  The plaintiffs state that because foreign tyrants are not allowed immunity for acts of torture, neither should the defendants in this case. *Id.* at 12-13 (citing *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980); *Trahano v. Marcos*, 878 F.2d 1439 (9th Cir. 1989); *In re: Estate of Marcos Human Rights Litig.*, 978 F.2d 493, 497-98 & n.10 (9th Cir. 1992); *In re: Estate of Marcos Human Rights Litig.*, 910 F. Supp. 1460, 1463 (D. Haw. 1995); *In re: Estate of Marcos Human Rights Litig.*, 25 F.3d 1467, 1472 (9th Cir. 1994); *Xuncax v. Gramajo*, 886 F. Supp. 162, 175-76 (D. Mass. 1995)).  The plaintiffs' argument lacks merit.  These cases do not align with the facts presently before the court in that they involve foreign officials ineligible under the FTCA to receive immunity but eligible for immunity under various legislative acts and principles of international law (e.g., Foreign Sovereign Immunity Act, 28 U.S.C. § 1605; Torture Victims Protections Act, 28 U.S.C. § 1350 Note; Act of State Doctrine; Head of State Immunity).  By enacting the FTCA, Congress directed that state law governs the scope of employment for claims brought against federal employees.  For this reason, case law interpreting legislation governing foreign officials is inapplicable to the present circumstance.

for the purpose of serving the master.  RESTATEMENT (SECOND) OF AGENCY § 228.  "[W]here the employee is in the course of performing job duties, the employee is presumed to be intending, at least in part, to further the employer's interests."  *Weinberg*, 518 A.2d at 989 (citation omitted).  Furthermore, the D.C. Circuit has stated that, "[t]he intent criterion focuses on the underlying dispute or controversy, not on the nature of the tort, and is broad enough to embrace any intentional tort arising out of a dispute that 'was originally undertaken on the employer's behalf.'"  *Stokes*, 327 F.3d at 1216 (quoting *Weinberg*, 518 A.2d at 992).  Moreover, "[t]he employer does not avoid liability for the employee's intentional torts . . . if the tort is committed partially because of a personal motive, such as revenge, as long as 'the employee [is] actuated, at least in part, by a desire to serve his principal's interest.'"  *Weinberg*, 518 A.2d at 988 (citing *Jordan v. Medley*, 711 F.2d 211, 214 (D.C. Cir. 1983) and RESTATEMENT (SECOND) OF AGENCY § 245 cmt. f (1958)).

The plaintiffs do not allege that the tortious actions arose purely from personal motives, but claim that the defendants' actions are inextricably intertwined with their respective roles in the military.  Compl. ¶¶ 37-137 (detailing the defendants' alleged actions within the context of the United States' military actions in Afghanistan following the September 11, 2001 attacks).  As the Supreme Court recently stated, "detention of individuals . . . for the duration of the particular conflict in which they were captured, is so fundamental and accepted an incident to war as to be an exercise of the 'necessary and appropriate force' Congress has authorized the President to use."  *Hamdi v. Rumsfeld,* 542 U.S. 507, 518 (2004).

The plaintiffs' allegations of torture, though reprehensible, do not offset the presumption that these individuals were acting on behalf of their employer during "the course of performing

job duties." *Weinberg*, 518 A.2d at 989.  The plaintiffs have not proffered any evidence that would lead this court to believe that the defendants had any motive divorced from the policy of the United States to quash terrorism around the world.  *Weinberg*, 518 A.2d at 990 (excluding actions committed solely for the servant's own purposes from the scope of employment).  Thus, the court rules that the individual defendants were acting, at least in part, to further the interests of their employer, the United States.

### iv.   Foreseeability of the Conduct

Finally, the court addresses whether the use of force was foreseeable.  RESTATEMENT (SECOND) OF AGENCY § 228.  "The inquiry is necessarily whether the intentional tort was foreseeable, or whether it was 'unexpectable in view of the duties of the servant.'"  *Majano v. Kim*, No. CIV.A.04-201, 2005 WL 839546, at *8 (D.D.C. April 11, 2005) (quoting RESTATEMENT (SECOND) OF AGENCY § 245)).  However, "a broad range of intentional tortious conduct has been found to be within the scope of employment despite the violence by which injury was inflicted."  *Id.*  In fact, employers may be held liable for "foreseeable altercations [that] may precipitate violence . . . even though the particular type of violence was not in itself anticipated or foreseeable."  *Lyon*, 533 F.2d at 651.

The court in *Majano* addressed this issue in depth.  In *Majano*, a manager of the Smithsonian tried to enter a secured building without using her identification card.  2005 WL 839546, at *2.  A janitor asked to see her identification before allowing her in, but rather than showing her identification, the manager became angry and assaulted the janitor.  *Id.*  The court held that "[a] physical or verbal altercation between fellow employees over the manner of entrance to a Smithsonian building in this heightened security environment is unfortunate – and

may be administratively – sanctionable – but nonetheless expectable." *Id*. at *9.

In the present case, the heightened climate of anxiety, due to the stresses of war and pressures after September 11 to uncover information leading to the capture of terrorists, would naturally lead to a greater desire to procure information and, therefore, more aggressive techniques for interrogations. Indeed, according to the plaintiffs, this increased motivation culminated in defendant Rumsfeld's December 2002 memorandum approving more aggressive interrogation techniques. Compl. ¶ 9. Although these aggressive techniques may be sanctionable within the military command, especially after the 2002 memorandum was revoked, the fact that abuse would occur is foreseeable. Accordingly, the defendants' employment situation did not present a mere opportunity for tortious activity to occur but provided the kindling for such activity to grow without the appropriate supervision. *See Boyken*, 484 A.2d at 563 (concluding that employment which affords the mere opportunity to pursue a personal venture is insufficient to make the employer liable). Consequently, the alleged actions of the defendants were within the scope of their employment.

## 2.    The Individual Defendants are not Liable Pursuant to the Exceptions to the Westfall Act

The plaintiffs contend, in the alternative, that the individual defendants can be held liable pursuant to one of the two exceptions under the Westfall Act. Specifically, a grant of immunity under the Westfall Act does not apply when a civil action is "brought [1] for violations of the Constitution of the United States, or . . . [2] for a violation of a statute of the United States under which such action against an individual is otherwise authorized." 28 U.S.C. § 2679(b)(2)(A)-(B). The plaintiffs argue that their claims brought under the Alien Tort Claims Act and

international law fall within both exceptions.  Pls.' Opp'n at 18-23.  For the reasons that follow, the court finds the plaintiff's position unpersuasive.

### a.   Constitutional Exception

The plaintiffs first assert that all of their claims are entitled to a waiver of immunity pursuant to the Westfall Act because they have alleged constitutional violations.  *Id*. at 18.  The plaintiffs state that "by its plain language [the Westfall Act] provides that the exclusive remedies of the FTCA do not apply to the plaintiffs' 'civil action' when a constitutional violation is asserted."  *Id*. at 19.  The plaintiffs assert that a "civil action" refers to the entire proceeding and not merely an individual claim.  *Id*. (citations omitted).

The plaintiffs' argument, however, has been rejected by the Supreme Court.[8]  *Finley v. United States*, 490 U.S. 545, 553-54 (1989), *superseded by statute,* 28 U.S.C. § 1367.[9]  In *Finley*, the Supreme Court declared that Congress' change to the FTCA from "claim against the United States," to "civil actions on claims against the United States," does not mean to "permit[] the assertion of jurisdiction over any 'civil action,' so long as that action *includes* a claim against the

---

[8]   The plaintiffs argue that because the international law and constitutional law claims arise out of "a common nucleus of operative facts," the defendants are not entitled to seek substitution of the United States for the plaintiffs' international law claims.  Pls.' Opp'n at 18-19.  For the reasons set forth in *Finley*, the court rejects the plaintiffs' argument.  *See Finley v. United States*, 490 U.S. 545, 553-556 (1989).

[9]   The plaintiffs argue that Congress' abrogation of the Court's interpretation in *Finley* "clearly indicates a congressional preference that FTCA cases arising out of a single nucleus of operative facts be tried in a single proceeding."  Pls.' Opp'n at 22, n.10.  Though Congress' passage of 28 U.S.C. § 1367 indicates its disagreement with the Supreme Court's interpretation of 28 U.S.C. § 1346, the statutory provision at issue in *Finley*, it has no bearing on the Court' interpretation of 28 U.S.C. § 2679.

United States."[10]  *Id.* at 554 (emphasis in original).

This interpretation is consistent with Congress' intent.  H.R. Rep. No. 100-700 at 5950

(1988) (stating that "[t]he 'exclusive remedy' provision . . . is intended to substitute the United

States as the solely permissible defendant in all common law tort actions").  Furthermore,

Congress indicated that the Westfall Act "would provide immunity for federal employees from

personal liability for common law torts committed within the scope of their employment."  *Id*. at

2.  The plaintiffs' suggested interpretation, in addition to conflicting with *Finley*, runs contrary to

Congress' intent.

### b.  Statutory Exemption

The plaintiffs also argue that they can invoke a waiver of immunity for purposes of the

Westfall Act because the individual defendants violated the Alien Tort Claims Act ("ATCA") by

committing torts "in violation of the law of nations[.]"[11]  Pls.' Opp'n at 22-24 (citing 28 U.S.C. §

1350).  They further assert that the plain meaning of the ATCA establishes both a 'jurisdictional

grant and a private right to sue for tortious violations of international law.  *Id.* at 23.  The

Supreme Court, however, recently held that the ATCA is strictly a jurisdictional statute available

to enforce a small number of international norms.  *Sosa v. Alvarez-Machain*, 542 U.S. 692, 729

(2004).  Before adapting the law of nations to private rights, the Court called on all federal courts

---

[10]     The Court attributed Congress' change in the statute to language presented in the
adoption of the Federal Rules of Civil Procedure which indicates that "there shall be one
form of action to be known as a 'civil action.'" *Finley*, 490 U.S. at 555; FED. R. CIV. P. 2.

[11]     Pursuant to the Alien Tort Claims Act ("ATCA"), "the district courts shall have original
jurisdiction of any civil action by an alien for a tort only, committed in violation of the
law of nations or treaty of the United States."  28 U.S.C. § 1350.

to exercise caution and only allow norms that are accepted "among civilized nations" to support a cause of action. *Id.* (citations omitted).[12]

A review of *Sosa* shows that the ATCA facilitates the bringing of an action for violations of the law of nations. The plain language of the ATCA, however, does not confer rights nor does it impose obligations or duties that, if violated, would trigger the Westfall Act's statutory exception. For the Westfall Act's statutory exception to apply, the ATCA would have to create substantive rights or duties that can be violated for purposes of the Westfall Act. *Schneider*, 310 F. Supp. 2d at 266 (relying on *Alvarez-Machain*, 266 F.3d at 1053-54 for the proposition that the ATCA cannot be violated for purposes of § 2679(b)(2)(B)). A claim brought pursuant to the ATCA, therefore, is based on a violation of rights conferred under international law, not the ATCA itself. *Alvarez-Machain*, 266 F.3d at 1053 (citing *Smith*, 499 U.S. at 174). Accordingly, the court concludes that the plaintiffs fail to satisfy the exception under 28 U.S.C. § 2679(b)(2)(B).

The plaintiffs again attempt to obtain a waiver of immunity under 28 U.S.C. § 2679(b)(2)(B) by arguing that their cause of action for violations of international law "arises under" the laws of the United States for purposes of jurisdiction under 28 U.S.C. § 1331. Pls.' Opp'n at 40-42. They claim that the defendants' obligation to uphold the Constitution follows the defendants wherever they are stationed or located. *Id.* The Westfall Act, however, is explicit

---

[12]    The Supreme Court in *Sosa* provided another reason for barring private causes of action for violations of international law. The Court warned that before recognizing these causes, the courts should consider "the potential implications for the foreign relations of the United States . . . [and be] wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 727 (2004). A more thorough discussion of the foreign affairs concerns calling for a bar to judicial review of this case is presented *infra* in Part III.B.3.

in allowing an exception only for "a violation of a statute of the United States [or] a violation of the Constitution of the United States," not federal common law or international law.  28 U.S.C. § 2679(b)(2)(A)-(B); *Schneider*, 310 F. Supp. 2d at 267.  Moreover, the plaintiffs cannot bring suit for a violation of 28 U.S.C. § 1331 because this statute confers only federal question jurisdiction, not a cause of action for violations of international law.  *Schneider*, 310 F. Supp. 2d at 267.  Accordingly, the court concludes that the plaintiffs fail to satisfy 28 U.S.C. § 2679(b)(2)(B).

In sum, the plaintiffs fail to meet their burden of proving that the individual defendants acted outside the scope of their employment or that their claims fall within one of the exceptions to the exclusive remedy provision of the FTCA.  That is, the plaintiffs fail to rebut the Attorney General's certification.  Therefore, the Attorney General's certification that the individual defendants acted within their scope of employment maintains its *prima facie* effect,[13] *Kimbro*, 30 F.3d at 1509, and the court substitutes the United States in place of the individual defendants. 28 U.S.C. § 2679(d)(2).  This substitution effectively grants the defendants absolute immunity for violations of international law.  *Mitchell v. Carlson*, 896 F.2d 128, 136 (5th Cir. 1990) (stating that "Congress made it clear that, once certified, federal employees remain immune from suit for their tortious actions taken within the scope of their government employment").

### 3.   The Plaintiffs Have Failed to Exhaust their Administrative Remedies

Under the FTCA, "[a]n action shall not be instituted upon a claim against the United

---

[13]   The court need not conduct discovery or evidentiary hearings because the facts alleged by the plaintiffs, taken as true, do not exceed the defendants' scope of employment.  *See Singleton v. United States*, 277 F.3d 864, 871 (6th Cir. 2002) (ruling that no hearing is necessary "where even if the plaintiff's assertions were true, the complaint allegations establish that the employee was acting within the scope of his/her employment") (internal quotations omitted).

States for money damages for injury or loss of property or personal injury or death . . .  unless the

claimant shall have first presented the claim to the appropriate Federal agency and his claim shall

have been finally denied by the agency in writing and sent by certified or registered mail."  28

U.S.C. § 2675(a).  Because the plaintiffs in this case did not proceed against the United States,

they did not first present their claim to the appropriate Federal agency.  Consequently, the

plaintiffs have not exhausted their administrative remedies.  *McNeil v. United States*, 508 U.S.

106, 113 (1993) (stating that the "FTCA bars claimants from bringing suit in federal court until

they have exhausted their administrative remedies").  Therefore, the court grants the defendants

motion to dismiss for lack of jurisdiction because 28 U.S.C. § 2675(a) requires the claimant to

bring a timely administrative claim before bringing suit against the government.  *See also*

*Simpkins v. Dist. of Columbia Gov't*, 108 F.3d 366, 371 (D.C. Cir. 1997) (holding that the district

court lacked jurisdiction because the claimant had not exhausted its administrative remedies).

### C.    The Court Grants the Defendants' Motion to Dismiss the Plaintiffs' Constitutional Violation Claims

In addition to their claims under international law, the plaintiffs claim that the defendant

violated the plaintiffs' rights under the Fifth and Eighth Amendments to the U.S. Constitution.

Compl. ¶¶ 185-202.  The defendants argue that under *Bivens v. Six Unknown Named Agents of*

*Fed. Bureau of Narcotics*, 403 U.S. 388, 389 (1971), they are entitled to qualified immunity.

Defs.' Mot. at 14-17.  For the reasons that follow, the court agrees.

### 1.    Legal Standard for a *Bivens* Claim and the Qualified Immunity Defense

A plaintiff may bring a civil action for money damages against a federal official in his or

her individual capacity for a violation of the plaintiffs' constitutional rights.  *Bivens*, 403 U.S. at

389.  Federal officials may be entitled to a defense of qualified immunity, however.  *Wilson v.*

*Layne*, 526 U.S. 603, 614 (1999) (citing *Harlow*, 457 U.S. at 818).  Qualified immunity "shield[s

officials] from liability for civil damages insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known."

*Harlow*, 457 U.S. at 818.  It "provides not simply a defense to liability, but also an 'entitlement

not to stand trial or face the other burdens of litigation.'"  *Farmer v. Moritsugu*, 163 F.3d 610,

613 (D.C. Cir. 1998) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

　　In evaluating a *Bivens* claim to which a defendant has raised the qualified immunity

defense, the court must follow a two-pronged analysis.  *Butera v. Dist. of Columbia*,[14] 235 F.3d

637, 646 (D.C. Cir. 2001) (citing *Wilson*, 526 U.S. at 609).  First, as a threshold matter, the court

must determine whether the plaintiff has alleged the deprivation of an actual constitutional right.

*Id.*; *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  In defining an "actual constitutional right," a

court must be careful to avoid defining the right in overly general terms "lest [it] strip the

qualified immunity defense of all meaning."  *Butera*, 235 F.3d at 646.  Instead, the court must

identify the right with the appropriate level of specificity so as to allow officials to reasonably

anticipate when their conduct may give rise to liability for damages.  *Id.* (quoting *Anderson v.*

*Creighton*, 483 U.S. 635, 639 (1987)).  Second, the court must decide whether the constitutional

right was clearly established at the time of the defendants' action.  *Id.*  A right is "clearly

established" if "the contours of that right [are] sufficiently clear that a reasonable official would

---

[14]　　*Butera* involved a suit brought against state officials pursuant to 42 U.S.C. § 1983.
*Butera,* 235 F.3d at 640-41.  The Supreme Court has held, however, that there is no
distinction between a *Bivens* suit and suit brought under section 1983 for purposes of
immunity.  *Butz v. Economou*, 438 U.S. 478, 508 (1978); *Gray v. Poole*, 243 F.3d 572,
577 n.4 (D.C. Cir. 2001).

understand that what he is doing violates that right." *Id.* (quoting *Wilson*, 526 U.S. at 614-15);

*see also Crawford-El v. Britton*, 523 U.S. 574, 591 (1998) (stating that "[i]f the law was clearly

established, the immunity defense ordinarily should fail, since a reasonably competent public

official should know the law governing his conduct").  Although the specific action in question

need not have been held unlawful by the courts, its unlawfulness in light of pre-existing law must

have been apparent to the defendant.  *Butera*, 235 F.3d at 646.

### 2.      The Defendants are Entitled to Qualified Immunity

The plaintiffs allege violations of their right to due process under the Fifth Amendment

and their right to be free from cruel and unusual punishment under the Eighth Amendment.

Compl. ¶¶ 185-202.  Specifically, the plaintiffs allege that military personnel subjected them to

arbitrary and extended deprivation of liberty without counsel or a hearing to address the

deprivation of liberty, frequent beatings, extended interrogations, insufficient shelter and food,

and other humiliating treatment.  *See generally* Compl.

Before the court can address whether the plaintiffs have alleged a constitutional

deprivation, or whether any such rights were clearly established, the rights must be defined at the

appropriate level of specificity; that is, "the court must define the right to a degree that would

allow officials 'reasonably [to] anticipate when their conduct may give rise to liability for

damages[.]'" *Butera*, 235 F.3d at 646 (internal quotation omitted); *Anderson*, 483 U.S. at 639

(rejecting the notion that a mere allegation of a right to "due process of law" is adequate to defeat

a qualified immunity defense against a due process claim).  Otherwise, defining a constitutional

right in overly broad language would "strip the qualified immunity defense of all meaning[.]"

*Butera*, 235 F.3d at 646.  For this case, the appropriate level of specificity requires inquiry into

whether the Constitution affords Fifth Amendment due process protection to aliens captured

abroad and brought within the exclusive jurisdiction and control of the United States at

Guantanamo.

> ### a.   The Court Reserves Judgment as to Whether the Plaintiffs have Stated a Constitutional Right

Though the court might typically hold that the actions alleged by the plaintiffs contravene

the Fifth Amendment[15] but not the Eighth Amendment,[16] the extent to which Guantanamo

detainees may avail themselves of constitutional protections is currently before the D.C. Circuit.

*Khalid*, 355 F. Supp. 2d 311, *appeal docketed*, No. 05-5063 (D.C. Cir. March 4, 2005).

This determination requires the court to balance the interests of the detainees'

constitutional rights, the executive branch's authority to classify individuals as enemy

---

[15]   *E.g.*, *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) (stating that "[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary government action"); *Rochin v. California*, 342 U.S. 165, 209 (1952) (espousing the "shock the conscience" test in determining that methods of gathering evidence that are "so brutal and so offensive to human dignity" violate the due process clause); *Brown v. Mississippi*, 297 U.S. 278, 285-86 (1938) (stating that "the rack and torture chamber may not be substituted for the witness stand," and that tortious interrogation constitutes a violation of an individuals' due process rights).

[16]   The Eighth Amendment is not relevant here because it only applies to convicted criminals.  *Bell v. Wolfish*, 441 U.S. 520, 579 (1979); *County of Sacramento v. Lewis*, 523 U.S. 833, 859 (1998).  If the plaintiffs' designation as enemy combatants qualified them for Eighth Amendment protections, that protection would further affirm the court's view that the defendants violated the plaintiffs' constitutional rights.  *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (concluding that "the Eighth Amendment prohibits punishments which, although not physically barbarous, 'involve the unnecessary and wanton infliction of pain'") (citation omitted); *Gregg v. Georgia*, 428 U.S. 153, 183 (1976) (holding that "the sanction imposed cannot be so totally without penological justification that it results in the gratuitous infliction of suffering"); *Trop v. Dulles*, 356 U.S. 86, 100 (1958) (noting that "[t]he basic concept underlying the Eighth Amendment is nothing less than the dignity of man"); *Wilkerson v. Utah*, 99 U.S. 130, 136 (1879) (stating that "it is safe to affirm that punishments of torture . . . are forbidden by [the Eighth Amendment] to the Constitution").

combatants and detain those individuals according to the government's discretion without undue court interference, and the scope of the judiciary's role in this case. Unsure of the way in which the D.C. Circuit will strike such a balance, or at least inform the contours of this trichotomy, a judicial determination by this court regarding the first prong under *Bivens* is imprudent. Because a resolution on this matter is forthcoming and because the court has independent grounds to dismiss the claims under the second *Bivens* prong, the court reserves judgment on whether the Guantanamo detainees enjoy Fifth and Eight Amendments protections. Consequently, the court begins its analysis with whether the plaintiffs' alleged constitutional rights were clearly established at the time of the alleged abuse.

### b.   Any Constitutional Right was Not Clearly Established

Assuming *arguendo* that the D.C. Circuit or Supreme Court extends constitutional protections to the detainees, the plaintiffs still have the burden of proving that these rights were clearly established at the time of the alleged conduct. *Butera*, 235 F.3d at 646. To prove their alleged constitutional rights were clearly established, the plaintiffs must show that a reasonable person in the defendants' position would have been aware that such rights existed. *Id.* A reasonable person's understanding must be taken "in light of the specific context of the case, [and] not as a broad general proposition." *Saucier*, 533 U.S. at 201. Although the specific action in question had not been held unlawful by the courts at the time of the plaintiffs' detention, the defendants are not entitled to qualified immunity if the unlawfulness of their alleged actions was *apparent* in light of pre-existing law. *Butera*, 235 F.3d at 646 (quoting *Anderson*, 483 U.S. at 640). Accordingly, the court will look to case law that was available to the defendants at the time of the plaintiffs' detention. Only with this foundation can the court determine whether a

27

reasonable person would, at the time of the alleged torture, be aware that the plaintiffs were entitled to the Fifth Amendment rights they claim.

In 1950, the Supreme Court in *Johnson v. Eisentrager*, decided the seminal case on the applicability of constitutional protections to non-resident enemy aliens. 339 U.S. 763 (1950). Specifically, these non-resident enemy aliens were German citizens detained in China by the United States military after Germany's surrender and designated as enemies by a Military Commission. *Id*. at 766. In determining what rights to afford these individuals, the Supreme Court began by noting that courts have only given an alien constitutional rights when the alien was present within the territorial jurisdiction of the Judiciary. *Id*. at 771; *accord United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 318 (1936) (stating that "neither the Constitution nor the laws passed in pursuance of it have any force in foreign territory unless in respect to our own citizens").

Of the aliens present within the Judiciary's territorial jurisdiction, the Court took care in distinguishing the rights afforded resident aliens and the rights afforded resident *enemy* aliens. *Eisentrager*, 339 U.S. at 770-77. The court stated that although resident aliens are granted a "generous and ascending scale of rights as he increases his identity with our society[,] . . . a resident enemy alien is constitutionally subject to summary arrest, internment and deportation whenever a 'declared war' exists." *Id*. at 770, 775; *accord Landon v. Plasencia*, 459 U.S. 21, 32 (1982) (stating that "once an alien gains admission to our country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly"). Indeed, the Court further acknowledged that "[e]xecutive power over aliens, undelayed and unhampered by litigation, has been deemed, throughout our history, essential to war-time security," and "it

28

seems not to have been supposed [by our founders] that a nation's obligations to its foes could ever be put on parity with those to its defenders." *Eisentrager*, 339 U.S. at 774, 775.  Therefore, the Court determined that giving constitutional rights to non-resident enemy aliens would "hamper the war effort and bring aid and comfort to the enemy" and be paradoxical in light of the fact that American citizens conscripted into military service are stripped of Fifth Amendment protections.  *Id*. at 779, 783.  Accordingly, the Court concluded that because the "prisoners were at no relevant time within any territory over which the United States is sovereign, and the scenes of their offense, their capture, their trial, and their punishment were all beyond the territorial jurisdiction of the United States[,]" non-resident enemy aliens are not entitled to Fifth Amendment protections.  *Id*. at 777, 785.

The plaintiffs insist, however, that *Eisentrager* is easily distinguishable because none of the plaintiffs in the instant case were charged with a crime, let alone charged and convicted of being enemy combatants as in *Eisentrager*.  While this distinction proved crucial in Supreme Court decisions after the plaintiffs' release from Guantanamo, discussed *infra*, the facts in this case are sufficiently similar[17] to the situation in *Eisentrager* for a reasonable person to conclude that detainees were not afforded the specific Fifth Amendment protections at issue.  Like

---

[17]     *Johnson v. Eisentrager* clearly distinguished between an alien friend (a subject of a foreign state at peace with the United States) and an alien enemy (a subject of a foreign state at war with the United States).  339 U.S. 763, at 769 n.2 (1950).  However, this distinction is difficult to apply to terrorists because they identify with a particular ideology rather than a particular state.  Given the pressures after 9/11 to identify and capture terrorists and the added difficulties in identifying terrorists today compared with identifying enemies during World War II, a military official should be afforded some deference in projecting what constitutional rights to afford individuals captured in a war-torn country, under battlefield conditions, and whose legal classification is ambiguous at best.  Indeed, the Supreme Court stated that "[i]t is war that exposes the *relative* vulnerability of the alien's status."  *Id*. at 771 (emphasis added).

*Eisentrager*, the plaintiffs are non-resident aliens captured abroad during a time of war and detained within a territory over which the United States does not have sovereignty.  *Rasul v. Bush*, 542 U.S. 466, 480 (2004).  Thus, the plaintiffs' attenuated connections with the United States coupled with the dispute over whether Guantanamo is within the territorial jurisdiction of the Judiciary[18] would lead a reasonable person to believe that the plaintiffs would not be afforded any constitutional protections even under a "generous and ascending scale of rights[.]" *Eisentrager*, 339 U.S. at 770.

Although *Eisentrager* was the seminal case at the time of the plaintiffs' detainment, other cases illuminate this clouded area of law.  For example, in *United States v. Verdugo-Urquidez* the Court affirmed and summarized the holding in *Eisentrager* and its progeny as "establish[ing] only that aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country."  494 U.S. 259, 271 (1990) (citing *Plyler v. Doe*, 457 U.S. 202, 212 (1982)).  In *Verdugo-Urquidez*, the respondent, a citizen and resident of Mexico, was arrested by Mexican police officers and transported to the United States.  *Id*. at 262.  Subsequently, Drug Enforcement Agency agents in concert with

---

[18]     As discussed in *Rasul v. Bush*, the nature of Guantanamo remaining under "the ultimate sovereignty of the Republic of Cuba" yet at the same time under the "complete jurisdiction and control" of the United States is problematic in determining the level of rights to afford detainees.  542 U.S. at 471 (citation omitted).  Because Guantanamo exists in a jurisdictional vacuum, not until *Rasul* was it clear that a district court could hear habeas petitions brought by detainees held there.  Justice Kennedy in his concurrence viewed Guantanamo from "a practical perspective" stating that "the indefinite lease of Guantanamo Bay has produced a place that belongs to the United States, extending the 'implied protection' of the United States to it."  *Id*. at 487 (citation omitted).  In contrast, Justice Scalia in his dissent declared that Guantanamo is "beyond the territorial jurisdiction of all [U.S.] courts."  *Id*. at 488.  Justice Scalia added also that, although Guantanamo is under the "jurisdiction and control" of the United States, sovereignty is the threshold test for extending constitutional protections to aliens, and moreover, it is up to Congress to give jurisdiction to the courts.  *Id*. at 501.

Mexican police officers searched his property in Mexico without a warrant. *Id.* The respondent claimed that the evidence submitted against him at trial was obtained in violation of the Fourth Amendment and should therefore be excluded. *Id.* at 263. The Court disagreed because the respondent had no previous voluntary connection with this country and his only connections arose from his brief detainment in California. *Id.* at 271. Furthermore, relying on *Eisentrager*, the Court reaffirmed its desire to avoid applying constitutional rights to aliens when it "could significantly disrupt the ability of the political branches to respond to foreign situations involving our national interest." *Id.* at 273-74. The Court concluded that at least short term "lawful but involuntary [presence] is not of the sort to indicate any substantial connection with our country[,]" and thus, constitutional protections do not apply to searches of a non-resident alien's property abroad. *Id.* at 271. Thus, while the plaintiffs did have contact with the United States, like the respondent in *Verdugo*, that contact was limited to the detention.

At the time of the plaintiffs' detainment, both *Eisentrager* and *Verdugo-Urquidez* [19] cautioned courts from interfering with foreign activities – especially activities related to national security. *Verdugo-Urquidez*, 494 U.S. at 273. These cases indicate that the Constitution applies only once aliens were within the territory of the United States and developed substantial contacts in this country. *Id.* at 271. Indeed, not until the Supreme Court decisions in *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) (granting Guantanamo detainees the right to counsel) and *Rasul v. Bush*, 542 U.S. 466 (2004) (granting federal courts jurisdiction to hear Guantanamo detainees' habeas petitions), both decided after the plaintiffs' release from Guantanamo, were military personnel

---

[19] *See Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 201-02 (D.C. Cir. 2001) (adopting the *Verdugo-Urquidez* test in applying due process rights to a foreign terrorist organization).

provided their first indication that detainees may be afforded a degree of constitutional

protection.  These cases provide the first decisions dealing precisely with the facts and basic

concerns presented here (9/11, Authorization for Use of Military Force, GTMO).  The plaintiffs

have provided no case law, and the court finds none, supporting a conclusion that military

officials would have been aware, in light of the state of the law at the time, that detainees should

be afforded the rights they now claim.  Accordingly, due to the unsettled nature of Guantanamo

detainees' constitutional rights in American courts, the defendants cannot be said to have been

"plainly incompetent" or to have "knowingly violated the law," and therefore are entitled to

qualified immunity.[20]  *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (stating that "the qualified

immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly

incompetent or those who knowingly violate the law'") (internal quotations omitted).

### D.    The Court Defers Ruling on the Defendants' Motion to Dismiss the Plaintiffs' Religious Freedom Restoration Act Claims

The plaintiffs allege that the defendants' actions violated their free exercise rights as

protected by the Religious Freedom Restoration Act ("RFRA").  Compl. ¶¶ 203-208.  The

defendants, however, contend that the Act does not apply extraterritorially and alternatively, that

the defendants are once again entitled to qualified immunity as to this claim.  Defs.' Mot. at 24-

27.

"Acts of Congress normally do not have extraterritorial application unless such an intent

is clearly manifested."  *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 188 (1993) (stating that

---

[20]    A final note, which reaffirms the court's holding today, comes from dicta in *Jifry v. Fed. Aviation Admin.,* stating, "[t]he Supreme Court has long held that non-resident aliens who have insufficient contacts with the United States are not entitled to Fifth Amendment protections."  370 F.3d 1174, 1182 (D.C. Cir. 2004).

this "presumption has special force when we are construing treaty and statutory provisions that may involve foreign and military affairs for which the President has unique responsibility") (citing *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936)).  In determining whether RFRA has extra-territorial application, the court looks to the legislative history.

Congress enacted RFRA in response to *Employment Division v. Smith*, 494 U.S. 872 (1990); 42 U.S.C. § 2000bb(a)(4).  As stated in § 2000bb(a)(4), that decision "virtually eliminated the requirements that the government justify burdens on religious exercise imposed by laws neutral toward religion." *Id.*  RFRA provides that the "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless the government demonstrates a "compelling governmental interest" and uses the "least restrictive means" of furthering that interest.  42 U.S.C. § 2000bb-1(a) - (b); *Holy Land Found. for Relief and Dev. v. Ashcroft*, 333 F.3d 156, 166-68 (D.C. Cir. 2003).  In *City of Boerne v. Flores*, 521 U.S. 507, 514 (1997), the Court held the RFRA unconstitutional as applied to state action. *Id.*  However, "the portion of RFRA remaining after *City of Boerne* . . . the portion . . . applicable to the federal government . . . survived the Supreme Court's decision striking down the statute as applied to the States." *Henderson v. Kennedy*, 265 F.3d 1072, 1073 (D.C. Cir. 2001) (" Henderson II").

The historical development of RFRA, to undo *Employment Division v. Smith*, belies any assertion that Congress intended RFRA to have extra-territorial application.  The plaintiffs have not pointed to any case law persuading this court of Congress' intentions to apply the Act extra-territorially, and the court finds no such reason to do so now.  Nevertheless, GTMO is a "territory over which the U.S. exercises plenary and exclusive authority." *Rasul*, 542 U.S. at 466.  As

Justice Scalia interpreted the majority opinion in *Rasul*, "not only § 2241 but presumably *all* United States law applies there – including, for example, the federal cause of action recognized in *Bivens*[.]" *Rasul v. Bush*, 542 U.S. at 500 (emphasis in original) (Scalia, J., dissenting). Based on Justice Scalia's interpretation, RFRA applies to persons detained at Guantanamo. The parties' briefing on this issue, however, is inadequate.

The defendants argue, in the alternative, that they are entitled to qualified immunity from suit for damages arising from any violation of RFRA. Defs.' Mot. at 27. The parties' briefing as to this issue is also inadequate. For this reason, the court directs the parties to submit supplemental briefing to the court on these issues within 45 days of this opinion.[21] Thus, the court defers ruling on the defendants' motion to dismiss the plaintiffs' RFRA claim.

## IV.   CONCLUSION

For the foregoing reasons, the court grants in part and defers ruling in part on the defendants' motion to dismiss. An order directing the parties in a manner consistent with this memorandum opinion is separately and contemporaneously issued this 6th day of February, 2006.

RICARDO M. URBINA
United States District Judge

---

[21]   The parties will each then have a period of 20 days within which to file responses to the supplemental briefing.