# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| SHAFIQ RASUL *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 04-1864 (RMU) |
| | : | | |
| v. | : | Document No.: | 8 |
| | : | | |
| DONALD RUMSFELD *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## MEMORANDUM OPINION

### DENYING THE DEFENDANTS' MOTION TO DISMISS THE
### RELIGIOUS FREEDOM RESTORATION ACT CLAIM

## I.  INTRODUCTION

The plaintiffs, former detainees at the United States Naval Station at Guantanamo Bay, Cuba ("GTMO" or "Guantanamo"), allege that the defendants engaged in depraved acts, which violated their rights under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb, *et seq.*  Specifically, the plaintiffs assert various encroachments upon their religious liberties, including harassment in the practice of their religion, forced shaving of their religious beards and placing the Koran in the toilet.  Currently before the court is the defendants' motion to dismiss the plaintiffs' RFRA claim for failure to state a claim and because the defendants are entitled to qualified immunity.  Because RFRA applies to government action in GTMO, and because the plaintiffs allege acts which substantially burden their religious exercise, the plaintiffs succeed in pleading a viable cause of action.  Furthermore, because the defendants' alleged actions violate rights clearly established at the time the defendants allegedly committed them, they are not entitled to any qualified immunity.  For these reasons, the court denies their motion to dismiss the plaintiffs' RFRA claim.

## II.   BACKGROUND

### A.   Factual Background

**The plaintiffs allege the following**:

In the months immediately following the September 11 attacks on America, the plaintiffs, all citizens of the United Kingdom, were conducting humanitarian relief in Afghanistan and were trying to return to England.  Compl. ¶¶ 2-3, 35.  On November 28, 2001, an Uzbek warlord, General Rashid Dostum, captured three of the plaintiffs – Shafiq Rasul, Asif Iqbal, and Rhuhel Ahmed.  *Id*. ¶ 2.  One month later, General Dostum handed them over to the United States for a bounty.  *Id*. ¶¶ 2, 42-44.  After two weeks of suffering extensive abuse and interrogations under United States' custody, the military transported Rasul and Iqbal from Afghanistan to GTMO.  *Id*. ¶¶ 37-64.  Ahmed, however, stayed in Afghanistan for six weeks under United States custody, eventually succumbing to pervasive interrogation techniques and falsely confessing to having ties with Al Qaeda.  *Id*. ¶ 62.  Only then, in February 2002, did the United States transport Ahmed to Guantanamo.  *Id*. ¶ 63.

The Taliban captured the fourth plaintiff, Jamal Al-Harith, in Afghanistan.  *Id*. ¶ 3.  The Taliban accused Al-Harith of spying for the British government and tortured him.  *Id*.  When the Taliban fell, Al-Harith was released and immediately contacted the British embassy officials to coordinate his evacuation.  *Id*.  After a month of coordinating with British officials, United States forces detained him and, in February of 2002, transported him to GTMO.  *Id*. ¶¶ 3-4, 63.

Shortly before the plaintiffs' arrival in Guantanamo Bay in December 2002, defendant Donald Rumsfeld signed a memorandum approving more aggressive interrogation techniques that allegedly departed from the standards of care normally afforded military prisoners.  *Id*. ¶ 9.

Some of these previously prohibited techniques includes forcing the prisoners to endure stress-positions for up to four consecutive hours, disrobing prisoners, intimidating prisoners with dogs, twenty-hour interrogation sessions, forcing prisoners to wear hoods, shaving their hair, isolating the prisoners in total darkness and silence, and using physical contact. *Id*.  In April 2003, Rumsfeld withdrew approval of these tactics. *Id*. ¶¶ 10-11.

**The plaintiffs further allege that**:

Following this revocation, the detainees at GTMO continued to suffer from inhumane treatment. *Id*. ¶¶ 65-158.  During the United States' detainment of the plaintiffs at GTMO, which has lasted over two years, the plaintiffs suffered repeated beatings and forced body cavity searches. *Id*. ¶¶ 4, 6.  Furthermore, prison guards frequently shackled the plaintiffs for many hours, causing wounds and permanent scarring, forced them to remain in stressful positions for hours, injected unknown substances into their bodies, and required them to live in cramped cages without protection from the elements. *Id*. ¶¶ 6, 70, 72, 85.  In addition, the guards deprived the plaintiffs of adequate food, sleep, and communication with family members. *Id*. ¶ 6.  The guards also humiliated and harassed the plaintiffs as they tried to practice their religion. *Id*.  After months of extreme hardship and relentless interrogations, Rasul and Iqbal relented and confessed (falsely) to having ties with Al Qaeda. *Id*. ¶¶ 110, 127.  Despite their confessions, after more than two years in United States custody without having any charges brought against them, in March of 2004, the United States released all of the plaintiffs, and they returned to their homes in the United Kingdom. *Id*. ¶ 137.

### B.   Procedural Background

The plaintiffs filed the instant case against various military officials on October 27, 2004.[1]  On March 16, 2005, the defendants filed a motion to dismiss for lack of subject-matter jurisdiction and failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

On February 6, 2006, this court issued a memorandum opinion dismissing the plaintiffs' international law claims and the plaintiffs' constitutional claims.  Mem. Op. (Feb. 6. 2006).  The court ruled that because the plaintiffs had not exhausted their administrative remedies by bringing their international law claims to an appropriate Federal agency, the plaintiffs' international law claims were not ripe.  *Id.*  As to the plaintiffs' constitutional law claims, the court ruled that the defendants are entitled to qualified immunity.  *Id.*  The court deferred ruling on the defendants' motion to dismiss the plaintiffs' RFRA claims pending further briefing by the parties.  *Id.*  Having received supplemental briefing from the parties, the court turns now to the merits of that motion.

---

[1]     The defendants are Donald Rumsfeld, Secretary of Defense; Air Force General Richard Myers, Former Chairman of the Joint Chiefs of Staff; Air Army Major General Geoffrey Miller, Former Commander of the Joint Task Force at Guantanamo Bay Naval Base; Army General James Hill, Commander of the United States Southern Command; Army Major General Michael Dunlavey, Former Commander of the Joint Task Force at Guantanamo Bay Naval Base; Army Brigadier General Jay Hood, Commander of the Joint Task Force at Guantanamo Bay Naval Base; Marine Brigadier General Michael Lehnert, Commander of the Joint Task Force-160 at Guantanamo Bay Naval Base; Army Colonel Nelson Cannon, Commander at Camp Delta at Guantanamo Bay Naval Base; Army Colonel Terry Carrico, Commander of Camp X-Ray-Camp Delta at Guantanamo Bay Naval Base; Army Lieutenant Colonel William Cline, Commander of Camp Delta at Guantanamo Bay Naval Base; Army Lieutenant Colonel Diane Beaver, Legal Advisor to General Dunlevey; and John Does 1-100.  *See* Compl.

### III.   ANALYSIS

#### A.   Legal Standard for a 12(b)(1) Motion to Dismiss

Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288-89 (1938); *see also Gen. Motors Corp. v. Envtl. Prot. Agency*, 363 F.3d 442, 448 (D.C. Cir. 2004) (noting that "[a]s a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction").

Because "subject-matter jurisdiction is an 'Art. III as well as a statutory requirement[,] no action of the parties can confer subject-matter jurisdiction upon a federal court.'" *Akinseye v. Dist. of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003) (quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxite de Guinea*, 456 U.S. 694, 702 (1982)).  On a motion to dismiss for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing that the court has subject-matter jurisdiction.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  The court may dismiss a complaint for lack of subject-matter jurisdiction only if "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Empagran S.A. v. F. Hoffman-Laroche, Ltd.*, 315 F.3d 338, 343 (D.C. Cir. 2003) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

Because subject-matter jurisdiction focuses on the court's power to hear the claim, however, the court must give the plaintiff's factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion for failure to state a claim.  *Macharia v. United States*, 334 F.3d 61, 64, 69 (D.C. Cir. 2003); *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).  Moreover, the court

is not limited to the allegations contained in the complaint. *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987). Instead, to determine whether it has jurisdiction over the claim, the court may consider materials outside the pleadings. *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).

## B.   Legal Standard for a 12(b)(6) Motion to Dismiss

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a complaint. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). The complaint need only set forth a short and plain statement of the claim, giving the defendant fair notice of the claim and the grounds upon which it rests. *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1040 (D.C. Cir. 2003) (citing FED. R. CIV. P. 8(a)(2) and *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). "Such simplified notice pleading is made possible by the liberal opportunity for discovery and the other pre-trial procedures established by the Rules to disclose more precisely the basis of both claim and defense to define more narrowly the disputed facts and issues." *Conley*, 355 U.S. at 47-48 (internal quotation marks omitted). It is not necessary for the plaintiff to plead all elements of his prima facie case in the complaint, *Swierkiewicz v. Sonoma N.A.*, 534 U.S. 506, 511-14 (2002), or "plead law or match facts to every element of a legal theory," *Krieger v. Fadely*, 211 F.3d 134, 136 (D.C. Cir. 2000) (internal quotation marks and citation omitted).

Accordingly, "the accepted rule in every type of case" is that a court should not dismiss a complaint for failure to state a claim unless the defendant can show beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Warren v. Dist. of Columbia*, 353 F.3d 36, 37 (D.C. Cir. 2004); *Kingman Park*, 348 F.3d at 1040. Thus, in resolving a Rule 12(b)(6) motion, the court must treat the complaint's factual allegations –

including mixed questions of law and fact – as true and draw all reasonable inferences therefrom

in the plaintiff's favor. *Macharia v. United States*, 334 F.3d 61, 64, 67 (D.C. Cir. 2003); *Holy*

*Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003); *Browning*, 292

F.3d at 242.  While many well-pleaded complaints are conclusory, the court need not accept as

true inferences unsupported by facts set out in the complaint or legal conclusions cast as factual

allegations. *Warren*, 353 F.3d at 39; *Browning*, 292 F.3d at 242.

### C.   The Court Denies the Defendants' Motion to Dismiss the Plaintiffs' RFRA Claim

### 1.   RFRA Applies to Government Action in GTMO

The defendants argue that RFRA does not apply extraterritorially, specifically, to the U.S.

Naval Base at Guantanamo Bay, Cuba.  Defs.' Mot. to Dismiss ("Defs.' Mot.") at 24-27.  The

defendants argue that Congress intended for RFRA to apply only to government action in the

continental United States. *Id.* at 24-25 (indicating that Congress' sole intent in creating RFRA

was to undo the Supreme Court's ruling in *Employment Division v. Smith*, 494 U.S. 872 (1989), a

case involving the application of Oregon drug laws to the ingestion of peyote in religious rites

and having no natural extraterritorial application); Defs.' Supplemental. Mem. of P. & A. in

Supp. of Defs.' Mot. ("Defs.' Supp.") at 6-7; Defs.' Reply to Pls.' Supplemental. Mem. of P. &

A. in Opp'n to Defs.' Mot. ("Defs.' Reply") at 3-4.  The plaintiffs argue that because RFRA

applies in "each territory and possession of the United States," 42 U.S.C. § 2000bb-2(2), the

plain language of the statute extends its application extraterritorially, including GTMO.  Pls.'

Brief in Supp. of their Claims Pursuant to RFRA ("Pls.' Supp.") at 2-8.

Under RFRA, "the government shall not substantially burden a person's exercise of

religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1(a).

The government may burden a person's exercise of religion, however, if the government action

"is in furtherance of a compelling governmental interest [and] is the least restrictive means of

furthering that compelling governmental interest." *Id.* § 2000bb-1(b). RFRA defines the

government to include, *inter alia*, covered entities. 42 U.S.C. § 2000bb-2(1). In turn, covered

entities means "the District of Columbia, the Commonwealth of Puerto Rico, and each territory

and possession of the United States." *Id.* § 2000bb-2(2). To determine whether the term

"covered entities" includes GTMO, the court must engage in statutory interpretation. Although

the defendants argue that RFRA applies only in the continental United States, that reading of the

statute makes little sense.

Statutory interpretation always begins, although it does not always end, with the language

of the statute. *Guam Indus. Serv., Inc. v. Rumsfeld,* 383 F. Supp. 2d 112, 116 (D.D.C. 2005)

(citing *In Re England,* 375 F.3d 1169, 1178 (D.C. Cir. 2004)); *see also Bedroc Ltd. v. United*

*States,* 541 U.S. 176, 183 (2004) (stating that the court "begins with the statutory text, and ends

there as well if the text is unambiguous"). "Before resorting to legislative history, a court . . .

should first look to the language of the law itself to determine its meaning." *United Mine*

*Workers v. Fed. Mine Safety and Health Review Comm'cn,* 671 F.2d 615, 621 (D.C. Cir. 1982).

The government urges the court to apply RFRA solely to the continental United States.

Defs.' Mot. at 26 (arguing that there "is a strong presumption that federal statutory law does 'not

have extraterritorial application,' and that presumption may be rebutted only when a contrary

'intent is clearly manifested'") (quoting *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 188

(1993)). The court can fathom no greater manifestation of Congress' intent then the plain text of

the statute.  *Bedrock Ltd.*, 541 U.S. at 183.

RFRA defines the term "government" to include, "a branch, department, agency,

instrumentality, and official . . . of the United States, or a covered entity."  42 U.S.C. § 2000bb-2

(1).  In essence, this provision reaffirms RFRA's application to United States governmental

action.[2]  *See City of Boerne v. Flores*, 521 U.S. 507, 516 (1997) (citing § 2000bb-3(a) in

recognizing RFRA's "universal coverage" to all Federal law and the "implementation of that

law").  Geographically, RFRA extends to "each territory and possession of the United States."[3]

*Id.*  Because RFRA applies to U.S. government action in the continental United States via §

2000bb-2(1) and § 2000bb-3(a), the defendants' call for the court to construe territory and

possession to mean the continental United States renders that phrase meaningless.  *Murphy*

*Exploration and Prod. Co. v. U.S. Dep't. of the Interior*, 252 F.3d 473, 481 (D.C. Cir. 2001)

(stating that "when 'construing a statute we are obliged to give effect, if possible, to every word

Congress used'") (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979)).  Indeed, the

defendants cite no case law construing the term "territory and possession of the United States" in

the fashion they now advocate.  Accordingly, the court rules that RFRA applies in U.S. territories

---

[2]     RFRA "applies to all Federal law, and the implementation of that law, whether statutory
or otherwise, and whether adopted before or after November 16, 1993."  42 U.S.C. §
2000bb-3(a).

[3]     The defendants actually argue that RFRA may not apply to federal territories and
possessions.  Defs.' Supp. at 4, n.3.  The defendants incorrectly look to *Cutter v.
Wilkinson*, 125 S. Ct. 2113, 2118 n.2 (2005) to support their contention.  In *Cutter*, the
Supreme Court recognized that it has not yet had occasion to rule on whether RFRA
remains operative upon the Federal government after *City of Boerne v. Flores*, 521 U.S.
507, 515-516 (1997).  *Cutter*, 125 S. Ct. at 2118 n.2.  The D.C. Circuit, however,
answered this question in the affirmative.  *Henderson v. Kennedy*, 265 F.3d 1072, 1073
(D.C. Cir. 2001).  Because RFRA is alive and well, the defendants' argument that it may
not apply to territories and possessions of the United States, despite the statute's express
application to those areas, 42 U.S.C. § 2000bb-2(2), borders on the laughable.

and possessions – areas outside of the continental United States.  *Guam v. Guerrero*, 290 F.3d

1210 (9th Cir. 2002) (ruling that RFRA applies in federal instrumentalities, in that case, Guam).

The court must now determine whether RFRA's coverage includes the Naval Base at

Guantanamo Bay.  To answer this question, the court must consider the nature and status of

GTMO.

Twice previously the Supreme Court considered and expressed its opinions on the status

of the Naval Base at Guantanamo Bay.  First, the Supreme Court considered whether the Fair

Labor Standards Act, 29 U.S.C. § 201, applied in a leasehold of the United States, located on the

Crown Colony of Bermuda.  *Vermilya-Brown v. Connell*, 335 U.S. 377, 378 (1948).  In its

analysis, the Court likened the Crown Colony of Bermuda to GTMO.  *Id.* at 383-85.  The Court

cited the provisions of the United States' lease agreement for GTMO from Cuba, which,

although recognizing "the continuance of the ultimate sovereignty of the Republic of Cuba over

[GTMO]," also stated that "the United States shall exercise complete jurisdiction and control

over and within said areas."  *Id*. at 385 n.5.  The Supreme Court ruled that, under the Defense

Base Act, 42 U.S.C. § 1651 (1942), Guantanamo Bay constituted a possession of the United

States.  *Id.* at 389.  According to the Defense Base Act, GTMO is a "[t]erritory or possession

outside the continental United States."  42 U.S.C. § 1651.  The Court's analysis in *Vermilya-*

*Brown* is not directly binding in this case both because the Court was not concerned directly with

GTMO but with Bermuda and because the Defense Base Act does not directly apply here.[4]

Nevertheless, the Court's analysis informs the contours both of the phrase "territory and

---

[4]        The Defense Base Act specifically governs the scope of the Longshore and Harbor
          Workers' Compensation Act, 33 U.S.C. § 901.

possession" and the nature of the United States' hold on GTMO.

More recently, the Court directly considered the nature of GTMO in ascertaining the applicability of habeas challenges under 28 U.S.C. § 2241.  *Rasul v. Bush*, 542 U.S. 466 (2004) (hereinafter "*Rasul I*").  Ruling that GTMO detainees can challenge their detention under 28 U.S.C. § 2241, the Court characterized GTMO as a "territory over which the United States exercises plenary and exclusive jurisdiction, but not 'ultimate sovereignty.'"  *Id.* at 480 (quoting Lease of Lands for Coaling and Naval Stations, Feb. 23, 1903, U.S.-Cuba, Art. III, T.S. No. 418 (hereinafter "Lease Agreement")).  As in the present case, in *Rasul I*, the government urged the Supreme Court to adhere to the "'longstanding principle of American law' that congressional legislation is presumed not to have extraterritorial application unless such intent is clearly manifested."  *Id.* at 480 (quoting *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991)).  The Court, relying on the explicit terms of the United States' lease agreement for the Guantanamo Bay Naval Base, ruled that "[w]hatever traction the presumption against extraterritoriality might have in other contexts, it certainly has no traction . . . with respect to persons detained within the territorial jurisdiction of the United States."[5]  *Id.* (noting that under the lease agreement, "the

---

[5]      The defendants remind the court that the presumption against extraterritorial application of statutes "has 'special force when [courts] are construing . . . provisions that may involve foreign and military affairs for which the President has unique responsibility.'"  Defs.' Mot. to Dismiss ("Defs.' Mot.") at 26 (quoting *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 188 (1993) (modifications in original).  While the defendants are certainly correct in their legal proposition, this heightened presumption still is overcome by the fact that "Guantanamo Bay is in every practical respect a United States territory," that it "is far removed from any hostilities," and the fact that the GTMO lease "is no ordinary lease . . . [it] has produced a place that belongs to the United States, extending the 'implied protection' of the United States to it."  *Rasul v. Bush*, 542 U.S. 466, 487 (2004) ("*Rasul I*") (Kennedy, J., concurring) (indicating that the legal notion "that there is a legal realm of political authority over military affairs where the judicial power may not enter" does not apply "in light of the status of Guantanamo Bay").

United States exercises 'complete jurisdiction and control' over the Guantanamo Bay Naval

Base, and may continue to exercise such control permanently if it so chooses") (quoting Lease

Agreement).

In essence, the United States exercises perhaps as much control as it possibly could short

of "ultimate sovereignty" over GTMO.[6]  *Id.* at 475.  As stated above, RFRA applies to "each

territory and possession of the United States."  42 U.S.C. § 2000bb-1(2).  If that language is to

have any meaning, it must include lands such as GTMO, over which the United States exercises

not some control or some jurisdiction, but "complete jurisdiction and control," i.e. "plenary and

exclusive jurisdiction."  *Rasul I* at 475, 480.  The express terms of RFRA, the Lease Agreement,

and the Supreme Court's characterization of GTMO in both *Vermilya-Brown* and *Rasul I* compel

this result.

The defendants ask the court to look to the legislative history of RFRA in ascertaining its

geographic reach.  Defs.' Supp. at 6-7; Defs.' Reply at 4.  The government's argument regarding

legislative history is unconvincing for two reasons.  First, the court will not look to legislative

history to replace a plain reading of an unambiguous statutory provision.  *Bedroc Ltd.,* 541 U.S.

at 183.  While the court may look to legislative history for assistance in interpreting ambiguous

statutory terms, the court will not interpret words out of the statute, in place for what the

government thinks Congress wanted.  *United Mine Workers,* 671 F.2d at 621 (stating that

"[c]ommittee reports, the statements of committee members, or other legislative materials . . .

---

[6]     As Justice Scalia interpreted the majority's opinion in *Rasul I*, "not only § 2241 but
presumably *all* United States law applies there – including, for example, the federal
cause of action recognized in *Bivens*[.]"  *Rasul I*, 542 U.S. at 500 (Scalia, J., dissenting)
(emphasis in original).

may not be used as a means for construing a statute contrary to its plain terms"). "The preeminent canon of statutory interpretation requires us to 'presume that [the] legislature says in a statute what it means and means in a statute what it says there.'" *Bedroc Ltd.,* 541 U.S. at 183. Here, RFRA applies to U.S. territories and possessions and, as stated previously, an interpretation limiting RFRA solely to the continental United States would rob those terms of any meaning.

Second, even if the court were to delve into the murky waters of legislative history and peruse the congressional record, that history does not necessarily support the defendants' reading. True, Congress' purpose in creating RFRA was, in part, to restore free exercise law to its stead prior to *Employment Division v. Smith. Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*, 126 S. Ct. 1211, 1216 (2006). Nevertheless, Congress' restorative motive does not lead inexorably to the conclusion that this constituted its sole purpose.[7] In fact, the plaintiffs brandish legislative history of their own suggesting a different congressional purpose from that espoused by the defendants. Pls.' Supp. at 9-10 (noting that Senator Strom Thurmond, in objecting to the 2000 amendment to RFRA, identified RFRA's application to soldiers stationed in Saudi Arabia and objected to the continued applicability of RFRA in that region) (citing 146 Cong. Rec. S7991, S7993). The plaintiffs' counter argument is compelling not because the court utilized this legislative history in interpreting the statute, but because it reaffirms the notion that selective citations to legislative history are wrought with speculation and akin to "looking over a crowd

---

[7]     Indeed, the statute expressly indicates a dual purpose; (1) to restore the compelling interest test set forth in *Sherbert v. Verner* and *Wisconsin v. Yoder, and* (2) "to provide a claim or defense to persons whose religious exercise is substantially burdened by government." 42 U.S.C. § 2000bb (b). The defendants' sidelong interpretation of the statute showcases the former at the expense of the latter.

and picking out your friends." *Exxon Mobile Corp. v. Allapattah Servs., Inc.*, 125 S. Ct. 2611

(2005) (quoting Judge Harold Leventhal's memorable phrase as stated in Wald, *Some*

*Observations on the Use of Legislative History in the 1981 Supreme Court Term*, 68 Iowa L.

Rev. 195, 214 (1983)).

The defendants also argue that the Religious Freedom Restoration Act ("RFRA") does

not apply to non-resident aliens.  Defs.' Reply at 3.  The defendants do not support their assertion

with any case law.  Contrary to the defendants' claim, RFRA expressly protects the religious

exercise of "persons," a broadly applicable term, commonly including aliens.  *E.g. U.S. v. Balsys*,

524 U.S. 666 (1998) (ruling that the term "persons" for purposes of the Fifth Amendment

includes aliens); *see also United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990) (citing

cases in which the Supreme Court held that aliens enjoy certain constitutional rights).  The

defendants contend that Congress may have lacked a specific intent to *include* aliens within the

scope of RFRA's protection.  Defs.' Reply at 3.  Nevertheless, because RFRA explicitly applies

to "persons," the defendants, at a bare minimum, must demonstrate that Congress specifically

intended to vest the term "persons" with a definition different at odds with its plain meaning.  *See*

*Love v. Johanns*, 439 F.3d 723, 732 (D.C. Cir. 2006) (refusing a statutory construction that "is

not a normal understanding of those words in the English language" and "that simply is not

within the plain meaning of the statute").  But, the defendants cite no authority to support their

construction of RFRA.  The defendants are correct that constitutional protections and the laws of

the United States do not automatically apply extraterritorially simply because an amendment

"speaks in the relatively universal term of 'person.'"  *Verdugo-Urquidez*, 494 U.S. at 260, 269

(citing *Johnson v. Eisentrager*, 339 U.S. 763 (1950)).  But here, GTMO is a U.S. territory, and

14

Congress has expressly extended RFRA to government action in each "territory and possession of the United States."  42 U.S.C. § 2000bb-2(2).

For these reasons, the court rules that RFRA applies to U.S. government action at the Naval Base in Guantanamo Bay.

## 2.     The Defendants Are Not Entitled to Qualified Immunity

The defendants argue that even if RFRA applies in GTMO, that the defendants are entitled to qualified immunity because its application in GTMO was not clearly established at the time of the alleged conduct at issue in this case.  Defs.' Supp. at 7.  The court cannot agree.

### a.     Legal Standard for a Qualified Immunity

A plaintiff may bring a civil action for money damages against a federal official in his or her individual capacity for violation of the plaintiff's constitutional rights.  *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 389 (1971).  Federal officials may be entitled to a defense of qualified immunity, however.  *Wilson v. Layne*, 526 U.S. 603, 614 (1999) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity "shield[s officials] from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Id.*  It "provides not simply a defense to liability, but also an entitlement not to stand trial or face the other burdens of litigation."  *Farmer v. Moritsugu*, 163 F.3d 610, 613 (D.C. Cir. 1998) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

In evaluating a *Bivens* claim to which a defendant has raised the qualified immunity

defense, the court must follow a two-pronged analysis. *Butera v. Dist. of Columbia,*[8] 235 F.3d 637, 646 (D.C. Cir. 2001) (citing *Wilson,* 526 U.S. at 609).  First, as a threshold matter, the court must determine whether the plaintiff has alleged the deprivation of an actual constitutional right. *Id.*; *Saucier v. Katz,* 533 U.S. 194, 201 (2001).  In defining an "actual constitutional right," a court must be careful to avoid defining the right in overly general terms "lest [it] strip the qualified immunity defense of all meaning."  *Butera,* 235 F.3d at 646.  Instead, the court must identify the right with the appropriate level of specificity so as to allow officials to reasonably anticipate when their conduct may give rise to liability for damages.  *Id.* (quoting *Anderson v. Creighton,* 483 U.S. 635, 639 (1987)).

Second, the court must decide whether the constitutional right was clearly established at the time of the defendant's action.  *Id.*  A right is "clearly established" if "the contours of that right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Id.* (quoting *Wilson,* 526 U.S. at 614-15); *see Crawford-El v. Britton,* 523 U.S. 574, 591 (1998) (stating that "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct").  Although the specific action in question need not have been held unlawful by the courts, its unlawfulness in light of pre-existing law must have been apparent to the defendant.  *Butera,* 235 F.3d at 646 (quoting *Anderson,* 483 U.S. at 640).

---

[8]     *Butera* involved a suit brought against state officials pursuant to 42 U.S.C. § 1983. *Butera v. Dist. of Columbia,* 235 F.3d 637, 640-41 (D.C. Cir. 2001).  The Supreme Court has held, however, that there is no distinction between a *Bivens* suit and a suit brought under section 1983 for purposes of immunity.  *Butz v. Economou,* 438 U.S. 478, 508 (1978); *Gray v. Poole,* 243 F.3d 572, 577 n.4 (D.C. Cir. 2001).

## b.   The Plaintiffs Allege a Clearly Established
## Statutory Right Under RFRA

Under *Bivens*, the two inquiries before the court are (1) whether the plaintiffs have

alleged an actual statutory right under RFRA, that is, whether the actions alleged in the plaintiffs'

complaint violate RFRA and, if so, (2) whether that right was clearly established at the time of

the defendants' actions.  *Butera*, 235 F.3d at 646.  The court concludes that the plaintiffs have

stated a claim under RFRA and that their rights under RFRA were clearly established at the time

of the defendants' actions.

### i.   The Plaintiffs Have Stated a Claim under RFRA

RFRA provides that the "[g]overnment shall not substantially burden a person's exercise

of religion even if the burden results from a rule of general applicability," unless the government

demonstrates a "compelling governmental interest" and uses the "least restrictive means" of

furthering that interest.[9]  42 U.S.C. § 2000bb-1(a),(b); *Holy Land Found. for Relief and Dev. v.*

*Ashcroft*, 333 F.3d 156, 166-68 (D.C. Cir. 2003).  To establish a prima facie case under RFRA, a

plaintiff must show that the government action "has placed a substantial burden on the

observation of a central religious belief or practice."  *Henderson v. Kennedy*, 253 F.3d 12, 17

(D.C. Cir. 2001) (recognizing that "'substantial burden' in RFRA is what the Supreme Court had

in mind in its pre-*Smith* opinion in *Jimmy Swaggart Ministries v. Bd. of Equalization*, 493 U.S.

378, 384-85 (1990)").  RFRA defines "exercise of religion" as "any exercise of religion, whether

---

[9]       In *City of Boerne v. Flores*, 521 U.S. 507 (1997), the Court held RFRA unconstitutional
as applied to state action.  *Id.* at 514.  However, "the portion of RFRA remaining after
*City of Boerne* . . . the portion . . . applicable to the federal government . . . survived the
Supreme Court's decision striking down the statute as applied to the States."  *Henderson
v. Kennedy*, 265 F.3d 1072, 1073 (D.C. Cir. 2001).

or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5(7)(A),

incorporated by 42 U.S.C. § 2000bb-2(4); *Henderson v. Kennedy*, 265 F.3d 1072, 1073 (D.C.

Cir. 2001).  If government action creates a substantial burden, a court can still uphold the action

if the defendant shows that the action serves a compelling government interest in the least

restrictive manner possible.  42 U.S.C. § 2000bb-1(b); *Gartrell v. Ashcroft*, 191 F. Supp. 2d 23,

38 (D.D.C. 2002).

Regarding the substantial burden prong, the plaintiffs allege, among other things, that the

defendants harassed the plaintiffs in the practice of their religion, subjected them to forced

shaving of their religious beards, and placed the Koran in the toilet.[10]  Compl.  ¶¶ 58, 78, 206.

Flushing the Koran down the toilet and forcing Muslims to shave their beards falls comfortably

---

[10]     The defendants contend that because the plaintiffs' claims do not arise from a facially
neutral government policy, they do not fall within the scope of RFRA.  Defs.' Supp. at
10 (citing *Larsen v. U.S. Navy*, 346 F. Supp. 2d 122 (D.D.C. 2004)).  In *Larsen*, this
court considered allegations that the plaintiffs, non-liturgical Protestant ministers, were
denied accession to the Navy Chaplain Corps because of "systematic and pervasive
religious prejudice."  *Id.* at 124.  The court ruled that RFRA was inapplicable to the
plaintiffs' claims because the plaintiffs were not challenging a neutral law of general
applicability but rather, were "attacking what they consider to be an intentionally
discriminatory policy."  *Id.* at 138.  The court's decision in *Larsen* was based on 42
U.S.C. § 2000bb(b)(1), which states that one purpose of RFRA was to "restore the
compelling interest test" which applied to facially neutral laws prior to the Supreme
Court's decision in *Employment Div. v. Smith*, 494 U.S. 872 (1990).  42 U.S.C. §
2000bb(b)(1).  By contrast, the plaintiffs in this case state a cognizable claim under
RFRA by alleging to be "persons whose religious exercise is substantially burdened by
government."  42 U.S.C. § 2000bb(b)(2).  Unlike in *Larsen*, wherein the plaintiffs were
challenging government policy, here, the plaintiffs are challenging government action.
RFRA contemplates not simply protection from government policy and law, but also
from government action.  42 U.S.C. § 2000bb-1(a) (stating that the "[g]overnment shall
not substantially burden a person's exercise of religion *even if* the burden results from a
rule of general applicability[.]").  The statutory phrase "even if" implies application in
other instances as well.  *See Omar v. Casterline*, 414 F. Supp. 2d 582, 594 (W.D. La.
2006) (stating that "[t]he use of the word 'even' suggests that it applies in other
circumstances as well").

within the conduct prohibited from government action by RFRA.  *Jackson v. Dist. of Columbia*,

254 F.3d 262, 265 (D.C. Cir. 2001) (identifying the RFRA concerns inherent in claims of

grooming policies); *Diaz v. Collins*, 114 F.3d 69, 72-73 (5th Cir. 1997) (ruling that a grooming

policy imposes a substantial hardship on the practice of faith).

### ii.   The Plaintiffs' Rights Under RFRA Were Clearly Established

RFRA is clear: "Government shall not substantially burden a person's exercise of

religion[.]"  42 U.S.C. § 2000bb-1(a).  And conduct as egregious as that alleged by the plaintiffs

constitute such a depravation.[11]  Nevertheless, though the nature of the conduct is prohibited by

RFRA, the defendants argue that RFRA's applicability in GTMO was not clearly established at

the time of the defendants' alleged conduct.  Defs.' Supp. at 8.  In support of this argument, the

defendants cite *Rasul I* and argue that because *Rasul I* "did not even consider whether RFRA or

any other federal law might apply at Guantanamo, it cannot logically be argued that the Supreme

Court's decision clearly establishes that RFRA applies there."  *Id.*  The court rejects this

argument for three reasons.

First, the Supreme Court decided *Rasul I* in 2004, but the defendants' alleged conduct in

this case took place prior, between 2001 and 2004.  *See generally,* Compl.  For this reason, even

if *Rasul I* called RFRA's application in GTMO into question, which it did not, it still would not

support the government's position that the law, *at the time of the defendants' conduct*, was not

---

[11]     Under RFRA, of course, the government is permitted to substantially burden a person's
exercise of religion if the burden (1) "is in furtherance of a compelling governmental
interest," and (2) "is the least restrictive means of furthering that compelling
governmental interest."  42 U.S.C. § 2000bb-1.  Here, the government does not argue
that any burdens were the least restrictive means of furthering a compelling
governmental interest.

well settled.  Second, *Rasul I* reaffirms the Court's statements in *Vermilya-Brown* that the United

States exercises "complete jurisdiction and control" over GTMO.  *Rasul I*, 542 U.S. at 480;

*Vermilya-Brown*, 335 U.S. at 382.  Third, every case has unique feathers, yet the court need not

find that "the very action in question has previously been held unlawful" to conclude that the

right was clearly established.  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

Turning to RFRA itself, the defendants provide the court with neither argument nor cases

calling RFRA's applicability in GTMO into question.  To the contrary, a review of the plain text

of RFRA, as the court discussed previously, demonstrates its broad reach.[12]  The defendants

argue that this court's prior opinion in *Larsen* places sufficient doubt as to the contours of a

properly framed RFRA claim such that the defendants should be entitled to qualified immunity.[13]

Defs.' Supp. at 9-10.  The court cannot agree.  Although the *Larsen* decision excludes a certain

category of claims under RFRA, (those challenging non-neutrally applicable laws or policies),

---

[12]    This court previously dismissed the plaintiffs' claims under the Fifth and Eighth
Amendments to the Constitution.  *Rasul v. Rumsfeld*, 414 F. Supp. 2d 26 (D.D.C. 2005).
The court ruled that the individual defendants were entitled to qualified immunity as to
these claims, principally, because the plaintiffs' rights under the Constitution were not
clearly established at the time of the alleged conduct.  *Id.* at 41.  The court based its
ruling on the legal proposition that "aliens receive constitutional protections when they
have come within the territory of the United States and developed substantial
connections with this country."  *Id.* at 43 (quoting *United States v. Verdugo-Urquidez*,
494 U.S. 259, 271 (1990)).  The court ruled that "not until the Supreme Court decisions
in *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) (granting Guantanamo detainees the right to
counsel) and *Rasul v. Bush*, 542 U.S. 466 (2004) (granting federal courts jurisdiction to
hear Guantanamo detainees' habeas petitions), both decided after the plaintiffs' release
from Guantanamo, were military personnel provided their first indication that detainees
may be afforded a degree of constitutional protection."  *Id.* at 44.  In contrast, here,
RFRA plainly applies to all U.S. territories and possessions, and the nature of GTMO, as
a U.S. territory, was clearly established at the time of the alleged conduct.

[13]    The defendants contention makes little sense given that this court issued its decision in
*Larsen* in November 2004, after the conduct alleged in this case had concluded.

the opinion in no way limits RFRA claims solely to government policies rather than government actions. Because RFRA explicitly provides "a claim or defense to persons whose religious exercise is substantially burdened by government," the defendants' reading of *Larsen* as calling RFRA's application to these allegations into question is not reasonable. In other words, a "reasonable official" should still have understood that "what he [was] doing violates that right." *Butera*, 235 F.3d at 646.

To be absolutely clear, the plaintiffs are not alleging some novel statutory violation, one in which the defendants can reasonably claim qualified immunity. The plaintiffs allege that representatives of the United States government perpetrated blatant and shocking acts against them on account of their religion. Such activities, if true, constitute a direct affront to one of this nation's most cherished constitutional traditions. *Jackson v. Dist. of Columbia*, 254 F.3d 262, 265 (D.C. Cir. 2001). Relevant here, the right to religious freedom is embodied within RFRA's prohibition on government action. 42 U.S.C. § 2000bb(2), 2000bb-1, 2000bb-2.

The statute's unambiguous application to U.S. territories and possessions[14] should have placed the defendants on notice that they were prohibited from the alleged conduct in Guantanamo. The court recognizes that the defendants are not constitutional law scholars well versed on the jurisdictional reach of RFRA. And yet, given the abhorrent nature of the allegations and given "our Nation's fundamental commitment to religious liberty," *McCreary County, Ky v. Am. Civil Liberties Union of Ky*, 125 S. Ct. 2722, 2746 (2005) (O'Conner, J., concurring), it seems to this court that in this case "a reasonable official would understand that

---

[14]     To say nothing of basic principles of morality and respect for human dignity.

21

what he is doing violates that right."[15]   *Hope*, 536 U.S. at 739 (quoting *Anderson v. Creighton*,

483 U.S. 635, 640 (1987)).   Because "[t]he shield provided by qualified immunity is designed to

protect all but the most brazen violators," *Bevill v. UAB Walker College*, 62 F. Supp. 2d 1259

(N.D. Al. 1999), the court finds it inapplicable in the present case.   Accordingly, the court rejects

these defendants' attempts to escape liability by means of qualified immunity.


## IV.   CONCLUSION

For the foregoing reasons, the court denies the defendants' motion to dismiss the

plaintiffs' RFRA claim.   An order directing the parties in a manner consistent with this

memorandum opinion is separately and contemporaneously issued this 8th day of May, 2006.


RICARDO M. URBINA
United States District Judge


---

[15]   The defendants make much of the D.C. Circuit's statement that the right to observe ones faith is "one of 'the most treasured birthrights of every *American*.'"   Defs.' Supp. at 7 (quoting *Jackson v. Dist. of Columbia*, 254 F.3d 262, 265 (D.C. Cir. 2001) (emphasis added)).   To the defendants, this statement affirms its view that the First Amendment, and by implication RFRA, applies solely to Americans.   Because the *Jackson* case did not present the Circuit with the question whether RFRA applies to non-Americans, the court reads the circuit's characterization of religious freedom as an affirmation of the importance of religious liberty in our society, not as a limitation on the breadth of its coverage under RFRA.   Indeed, because RFRA applies to all "persons," 42 U.S.C. § 2000bb-1(a), the court doubts that the Circuit meant to categorically exclude non-Americans from RFRA's protection, particularly in a case not presenting the Circuit with that question.